Eva Parham Marable

*v.*

State of Tennessee.

(*Nashville,* December Term, 1957.)

Opinion filed April 9, 1958.

442

H. Frank Taylor, J. P. Buchanan, Carl R. Hardin and Albert Williams, Nashville, for plaintiff in error.

Thomas H. Fox, Assistant Attorney General, for the State.

Mr. Justice Burnett delivered the opinion of the Court.

Mrs. Marable was convicted of murder in the second degree for the slaying of her husband, William C. Marable, Sr., and for this crime the jury fixed her punishment at not more than 20 years in the State Penitentiary.

In working this case we read the record which consists of approximately 1000 pages, including arguments of counsel and the charge of the court, before reading the briefs and assignments of error and reply thereto. In our experience on the bench it has not been our pleasure to have found two better briefs in any case. For the plaintiff in error and the State both, the statements of fact, the arguments and citations of law are an example that could well be followed in the preparation of any brief and assignments and reply thereto.

This case depends entirely upon circumstantial evidence to establish both the *corpus delicti* and the criminal agency of the accused. Though there are a number of assignments of error, all of which will be considered herein, the main argument before us was on the question

of whether or not this evidence did establish the *corpus delicti* and the criminal agency.

There is no real dispute as to the factual situation which is shown and both sides, to all intents and purposes, agree as to what these facts were.

The plaintiff in error was the wife of the deceased. They had been married a little less than a year at the time of the death of deceased and lived in his home which was located on Dickerson Road outside of the City Limits of the City of Nashville, Tennessee.

On Sunday afternoon of June 17, 1956, two sisters of the deceased visited in this home with Mr. and Mrs. Marable. At the time of this visitation both Mr. and Mrs. Marable were wearing summer clothes, he with Bermuda shorts and she with as little as she could to be decent. As said this visitation was on June 17, 1956. The following Thursday, June 21, 1956, his body was found in this home. On the date of this last visitation by these sisters, everything was peaceful and happy and it was shown that Mr. Marable, the deceased, enjoyed life and had a zest for living. He was not morbid or moody. Nor as far as the record shows had any disposition to contemplate suicide.

After this Sunday afternoon the deceased was not seen alive again. One or two witnesses claim that they saw him in a car on Wednesday before his body was found. One witness on the motion for new trial also claims this. After this Sunday, June 17, visitation, several efforts were made by the sisters of the deceased to talk to him between Monday evening of June 18, and the evening of June 21. Some of these were made in the daytime and

some as late as 10:00 o'clock at night. They say that the phone rang but there was no response. On Tuesday, June 19, the defendant called these sisters.

In the conversation with these sisters they were told by the plaintiff in error that she and their brother, the deceased, had had trouble and that she had left him; that the deceased had threatened to kill her and then kill himself; that the deceased had a knife in his hand when she left him; that she had found a paper which indicated that deceased had been to a doctor and she, plaintiff in error, feared that the deceased was trying to put her in an asylum. The plaintiff in error then requested one of the sisters to go out to their home for the purpose of seeing about the deceased.

One of these sisters, Mrs. Mayo, went to the home of plaintiff in error and deceased about 5:00 o'clock on Wednesday, June 20. She knocked and called to the deceased and got no response. She looked around the house and noticed that his car was in the garage; that the blinds were pulled and that the kitchen door was open. The other two entrances to the house were closed. After talking to her husband, there, they decided that probably her brother had walked down to a grocery store. Throughout the record there is some indication that the deceased's two sisters and other relatives were careful not to interfere or push themselves into the deceased's private or personal affairs.

On Thursday evening, June 21, Mrs. Mayo, a sister of the deceased, not having heard from him or not being able to reach him on the telephone, went with her husband out to deceased's house about 7:45 o'clock in the evening. When they got there Mrs. Mayo noticed that

apparently nothing had been changed since she was there the day before in reference to the blinds, the doors closed, etc. She and her husband knocked and called to the deceased and when they got no response they entered the home through the back door into the kitchen which was open as it had been on Wednesday the day before. After entering the kitchen and passing through the breakfast room into the living room, they discovered blood in the house which led them to the basement stairway door. Mr. Mayo opened this basement door a little bit and turned on the light and saw the deceased's body lying at the foot of the steps. As a result of this Mrs. Mayo went to the telephone in the living room to call for help and she found then that the cord to the receiver had been cut and that there was blood on the telephone. Mrs. Mayo then went across the street to a tourist court and called the Sheriff's office. As a result of this call investigators from that office were very shortly on the scene.

The body of the deceased was found lying on his back in a badly decomposed condition with maggots working in a wound on his throat, and in his eyes, nose and mouth. The wound varied in depth from about 1½ inches on the right side of deceased's throat to just barely under the skin at the other extremity in the clavicle region of his left shoulder. The proof also shows that the deceased was a right-handed man. The jugular vein was severed by the wound. No sharp instrument was found near the deceased's body nor elsewhere in the house although the registers and apparently everything in the house was torn up trying to find the instrument that caused this wound. A bloody bath towel was near the deceased's body. Blood was found in several rooms in the house.

The greater amounts appeared to be in the deceased's bedroom and near the wash basin in the bathroom. There was blood on the telephone and telephone table and it was noticed that a small rug had been placed in the door leading from the living room to the hall and bathroom, covering a part of the living room rug. This rug had been placed in that position covering the blood on the floor. There was also a small rug in the hallway which had considerably more blood on the bottom side than the top side. A copy of the Sunday Nashville newspaper and the deceased's glasses were found on the bed in his bedroom. A small amount of blood was also found on the deceased's bed with some spots on the newspaper. In the bathroom there was a towel rack immediately to the right of the wash basin.

The investigators found the plaintiff in error at the home of her daughter in Donelson, Tennessee. She was brought by one of the officers out to her and deceased's home and questioned there by the officers. They described her demeanor as being evasive and uncooperative. She asked no questions about where the deceased's body was found or about the condition of his body and stated that the deceased had been robbed. One of the officers was advised by her that she left their home, that is hers and the deceased's, on Monday afternoon after a sudden disagreement with her husband, the deceased. This disagreement resulted from the fact that the deceased had been going with another woman, according to the plaintiff in error. The plaintiff in error also told another officer that she had not seen the deceased since 10:30 A.M., on Monday, June 18. She did not show any emotion or shed a single tear. At this point it is interesting to note in

reading the record that when on Monday she approached a City Detective and told her story which will hereinafter be related, she did cry once or twice. The jury could have found that this was immediately after the homicide.

There is evidence in the record, which first popped out as unsolicited from one of these investigating officers, that the plaintiff in error was asked to take a lie detector test and she said that she would not answer until she had talked with her attorney. Her attorney later advised these officers that she would not submit to such a test. After this statement was volunteered he was cross examined by plaintiff in error's counsel at length on the question of taking a lie detector test. It appears at least twice and maybe three times in the record after this, and at the conclusion of the State's proof, that the plaintiff in error moved to strike this evidence from the record. At the conclusion of the State's proof this evidence was struck.

It was found during the investigation that the plaintiff in error had been back to the deceased's home on Wednesday, June 20, the day before his body was found, after having left on Monday. She told some of the investigating officers that she went back on Wednesday to get some pills, which were in the kitchen cabinet, that she had been taking. She said at the time that she did not see her husband, the deceased, but heard the fan running and thought that she heard a door slam.

At the time one of the Highway Patrolmen went to the plaintiff in error's daughter's home for the purpose of getting the plaintiff in error to go to the home of the deceased, the daughter immediately broke down and cried and called the plaintiff in error's attorney twice. It is

not clear from this record whether or not these calls were made before her mother left with the officers. Other acts of this daughter indicated that she was greatly concerned about her mother.

It was also learned during the investigation that the plaintiff in error on Monday, June 18, went to a barber shop where she knew a barber and got him away from his customers and asked him for a Mr. Biggerstaff's telephone number, stating that she wanted to obtain a pistol from him. She said that she had moved to the country and needed it for protection. Mr. Biggerstaff, on Thursday, June 21, the day the body was discovered, saw the defendant riding in a car over one of the bridges in town. He talked with her for a short time but she did not ask him to give her a pistol. This witness noticed that she did not appear to be herself, saying that she did not have the spirit she had had before.

About 6:00 o'clock on the evening of Monday, June 18, the plaintiff in error went to the home of City Detective Cobb and asked him to go to the deceased's home with her. She told this policeman that the deceased had threatened to put her in an asylum and that she had found a note about going to a doctor evidencing this fact. She told this police detective that before she would let him put her in an asylum, she would cut the deceased's throat and then cut her own. This witness, police detective, noticed that she was exceedingly excited and disturbed and cried once or twice. This was referred to briefly heretofore.

About dusk on Monday evening, June 18, the plaintiff in error went to a tourist court on the Nolensville Road which is close to the Williamson County Line. This tour-

ist court is some distance away from their home. She checked out the following morning but returned to the same tourist court the evening of Tuesday and spent another night there. She was carrying no baggage with her at either time. The proprietor of this tourist court was not acquainted with her but said that she looked honest and he cashed a check for her to pay her bill. This tourist court proprietor said that on the second night she was there she told him that she had had trouble with her husband and had legal difficulties and that she had not gone to her daughter's because she did not believe in crying on her relatives shoulders.

There is an abundance of proof in the record showing that it was the custom of the deceased to carry a black strong box in the trunk of his car. He kept in this box many valuable papers and at times was seen to have a considerable amount of money—six or eight thousand dollars—in this box. On the evening of June 21, when his body was found, the officers, when they went down in the basement to get this body, noticed the car of the deceased which was in the basement, (it was also a basement garage) had the lid of the trunk up, not closed. The door to this basement garage also latched on the inside of the basement.

The deceased's son who lives in another State was notified about the death of his father by one of his Aunt's and as a result he came to Tennessee to take the body back to Ohio. While in Tennessee he talked to the District Attorney General and asked about this strong box. He likewise told the District Attorney General about its contents. As a result of this conversation the District Attorney General attempted to locate this strong box and

through one of the Attorney's for the plaintiff in error the box was found. In other words the Attorney brought the box to the District Attorney General's office. The deceased's insurance policies, bank deposit statements and other valuable papers had already been delivered to the District Attorney General by the plaintiff in error's counsel. This box had been drilled open and the contents removed. A key and lock man of Nashville identified the box and testified that it was brought to him by some lady in the early part of the week of June 18, 1956, but that he could not identify the lady. He says that she stated to him that she had lost the key and as a result of this he had to drill off the lock.

There is medical evidence that it would take from eight to twenty-four hours for the deceased's body to putrefy as it was when found by the officers. There is no attempt by any of the witnesses to fix the exact time of the death. The embalmer said in his opinion that he had been dead from two to three days.

The plaintiff in error did not take the witness stand in her behalf.

In a circumstantial evidence case of the kind here the evidence is tested by the following rules:

"(1) It should be acted upon with caution; (2) all the essential facts must be consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; (3) the facts must exclude every other reasonable theory or hypothesis except that of guilt; (*Lancaster v. State,* 91 Tenn. 267, 18 S.W. 777) and (4) the facts must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable

452

doubt that the accused is the one who committed the offense.'' Wharton's Criminal Evidence, Vol. 2, pages 1605-1606.

"It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury, beyond a reasonable doubt, of all the facts necessary to constitute the crime charged * * *. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion and producing in effect a moral certainty that the accused, and no one else, committed the offense.'' Wharton, *supra*, pages 1609-1610.

And:

"Weight of circumstantial evidence is a question for the jury to determine. The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'' Wharton, *supra,* page 1611.

We must keep these cardinal rules before us in considering a case of the kind. The jury was properly and ably charged by the trial judge as to these various things. There is no complaint in reference to the charge.

■ ■ When we consider the evidence heretofore detailed it is our judgment that the evidence conclusively shows that the dead man did not commit suicide. He was not of that disposition, there was no instrument found around where the body was found; rugs had been put on top of blood where he had bled and other factual things, which in addition to the legal presumption against sui-

cide, clearly, to our minds show there was no possibility of suicide. The wound on his neck or throat indicates clearly that it was inflicted by another person and by a person other than the deceased because the deceased was a right-handed man and this wound as it went, obviously, and the jury could clearly reach this conclusion, would have been made from the right to the left, a right-handed man would have made it otherwise. Then the jury was clearly entitled to the inescapable conclusion that the deceased closed the basement door on his way down to get in his car to try to get help. He had gone to the telephone and found it cut and then the next thing that he knew was to go to his car, he had to go to the basement to do so, and there is where he fell and died. The evidence indicates (the jury clearly could draw this conclusion) that the deceased was wounded while lying on his bed and that immediately he ran to the bathroom where he obtained a a towel which he used as a tourniquet around his neck to prevent the blood from flowing from the wound. The jury clearly could conclude from the evidence above related that the defendant's actions during this investigation and that her actions taken on Monday, June 18, and on Thursday, June 21, all are sufficient to eliminate all reasonable hypothesis other than the guilt of the plaintiff in error.

There were police detectives and policemen who took pictures of things, took pictures of the bloody footprints leading from the bathroom to the basement; there is no finding anywhere of any indication that anybody else had broken into the house. There was no inference or indication in the record that anybody else's fingerprints or other things, had been in the house. All of this leads only

to the plaintiff in error. Clearly under the picture made by this proof the only reasonable hypothesis was that the plaintiff in error was guilty of this crime. She had a motive, according to her statement to Cobb and others she was afraid he was trying to put her in the asylum; she took his strong box which had contained much money and valuables and had the lock bored off. We do not know what was found in it (we say that she took it because that is clearly the only inference that the jury could draw when the box was missing and was brought to the court by one of her counsel).

It is argued that the normal evidence of taking this box and opening it should not be attributed to this plaintiff in error as would be to a stranger or an outsider who had taken it. We think though that the evidence and inferences to be drawn from it are stronger than if it had been taken by an outsider or a stranger. Here she knew of the strong box and she knew where it was kept; she knew that he carried large sums of money in it. Who else would have known to go and take the key and unlock the trunk of the car and take the box out of the car and get it, except the plaintiff in error? In the cross examination of the son of the deceased it was intimated he might have done so and have killed his father for the purpose—the boy was indebted to the father in a large sum. The jury clearly were warranted, and it is the only conclusion that they could reach under this record, that this was one of her purposes in killing him. There is some inference in the record or statement in the record by some witness that she said that she got this box to see if there were any love letters in it. She had made statements that her husband was going to jilt her

and pick up another woman, that he was going with another one then. Under such circumstances, especially in view of the fact that this record shows that this deceased and this woman lived together for a considerable period of time prior to their marriage. It seems to us in view of this fact that it could be readily concluded by a fact finding body, under the facts actually adduced here, that jealousy of a woman under such circumstances, if nothing else, might have caused a crime of the kind.

In the cross examination of the State's Investigator Cole, he volunteered the testimony which was not responsive to the question that the plaintiff in error had been asked to take a lie detector test and said that she would have to talk to her lawyer first. As a result of this statement being volunteered, counsel continued at some length to examine this witness on the question of the lie detector test but did not object to the statement of the witness as being unresponsive to the question or as being harmful in any way to the plaintiff in error. Later on another witness by the name of Richardson stated under direct examination that the plaintiff in error had refused a lie detector test because of advice of counsel, but there was no objection made to this statement when it was made. These witnesses were cross examined at length on this subject and later on, after some pages of testimony and some days of conducting the trial, counsel did move and asked the court to strike all the testimony relative to the plaintiff in error's refusal to submit to a lie detector test. After the conclusion of the State's evidence the court upon investigating authorities, did strike this evidence from the record and so instructed the jury.

■ The unquestioned and unanimous weight of authority and general rule is that the results of a lie detector test are inadmissible in evidence. See annotation in 23 A.L.R. 2d 1306, where cases from many States are digested.

■ The argument here in reference to the lie detector test, as above set forth (the witness having volunteered the fact that the plaintiff in error said she would not take a lie detector test but that she wanted to consult her counsel first, but after consulting her counsel she refused to take it) is that this is reversible error just to make the assertion that she would not take the lie detector test, as here, because it is argued that the impact of this refusal might affect the jurors minds to such an extent as to determine the guilt or innocence of the accused. As authority for this proposition the plaintiff in error cites the case of *State v. Kolander*, 236 Minn. 209, 52 N.W. 2d 458, 465, which holds this, that it is reversible error to do so. We, though, cannot agree with this holding herein for several reasons. In the first place the objectionable evidence after being volunteered by a State witness was gone into at length by further cross examination on the subject by the plaintiff in error. Under such circumstances we think that if the evidence was objectionable it is cured. *Baxter v. State*, 83 Tenn. 657, 663.

Then it is a well recognized principle of criminal law that:

"The actions and behavior of accused when charged with the crime, or when confronted with the consequences or with the scene or surroundings of the crime with which he is charged, or when brought before the

prosecuting witness for identification, or at the trial, are peculiarly relevant. In receiving evidence of this kind, it is not easy, if at all possible, for courts to draw any line segregating those acts which to some minds may seem significant of guilt from those which are irrelevant because justifying no such inference. Any *ex post facto* indication by accused of a desire to evade prosecution may be shown as one of series of circumstances from which guilt may be inferred." 22 C.J.S. Criminal Law sec. 623, p. 955.

Clearly if all of these different things can be shown to the jury, as many were herein as to the plaintiff in error, what she did, her demeanor, etc., it is hard to determine how a juror or the jury would attach more significance to the fact that they had refused a lie detector test on advice of counsel then to these things showing the demeanor and what they said, etc. Therefore it seems to us that there is a very fine, if any, technical legal difference, between admission of all of these things which are recognized universally, that are admissible and admitting the fact that the person refused to take a lie detector test. Be this as it may the determination of this question here does not depend on this fact because since the court at the end of the proof instructed the jury not to consider such evidence, and since it had been gone into repeatedly by the plaintiff in error as well as otherwise we see nothing prejudicial herein which the plaintiff in error can take advantage of. This Court long ago in a case cited both by the plaintiff in error and the State, of *Stokes v. State,* 64 Tenn. 619, held that we, the Supreme Court, would not reverse because of admission of incompetent evidence which was afterwards withdrawn, un-

less we were satisfied that the jury was in fact influenced by this incompetent evidence. We are not so impressed under this record.

This same case of *Stokes v. State, supra,* is cited by the plaintiff in error in her argument that to give evidence such as this was, that of the lie detector proposition, was in violation of her constitutional privilege. Tennessee Constitution, Article I, Section 9. The portion of course of this Article that is said to be violated is: "And shall not be compelled to give evidence against himself." The part of the Stokes case that is cited by the plaintiff in error as supporting her position that this was reversible error is that in the Stokes case the accused was asked to compare or make a footprint in some soft mud, in other words there he was asked to give evidence against himself in the presence of the jury and the holding there is directly based upon a violation of this constitutional mandate. The question involved in this case is entirely different from that involved in the Stokes case.

■ The District Attorney General in his closing argument quoted the famous poem that the late Mr. Chief Justice Green, when he was a Justice of this Court, quoted at the conclusion of his opinion in *Dietzel v. State,* 132 Tenn. 47, 177 S.W. 47. It is insisted here and assigned as error that this was prejudicial to the plaintiff in error because it was said that the District Attorney General was reading facts or relating facts of another case to the jury and not just law. At this point in the argument of the District Attorney General the plaintiff in error did make objection. The trial judge, as was his duty, instructed the jury and said that in his opinion that this was reading law and not facts and he exercised his discre-

tion in allowing this done. It seems to us after considering it and reading the poem as it is in the opinion that no particular facts of another case was made, it is just a poem which has indicated the age old saying that a criminal returns to the scene of the crime. That was justified under the facts of this case when the plaintiff in error admitted that she came back to her home where the dead man was the day before he was found in a state of putrefaction.

██ ██ There was argument and much attempted evidence, etc., at the trial to try to show that when she came in the kitchen that she could have seen this blood on the floor. The implication is that she told other witnesses that she did not, that all that she did, she heard a fan running and she thought she heard a door slam. Be this as it may these are purely questions for the jury here and since it is within the province and discretion of the trial judge as to what he shall permit or refuse to be read from an opinion, unless he does abuse this discretion and let them compare facts of another case to the facts of this case, this was not done in this argument though, then this is not prejudicial error. See *Bright v. State,* 191 Tenn. 249, 258, 232 S.W. 2d 53.

██ The full arguments of the defense and the prosecution are in this record and they are indeed very readable and interesting. In the outset we shall say that these arguments, as well as throughout the trial, both the District Attorney General and members of the plaintiff in error's staff were constantly bickering with each other as to one thing or another all through the trial. This same thing held true with one or the other making statements in the argument and the other denying it. There

is no specific objection during this argument to anything in the argument other than that last above referred to, that is, the allegation of reading facts of another case. The questions we are now reaching were assigned on the motion for new trial as erroneous. Frankly though we do not think that they are erroneous because there is nothing in that that could be prejudicial to the plaintiff in error. The same method of conduct throughout the entire trial was carried forth by each side bantering and bickering with the others over one thing or another. There was no specific objection made at the time these arguments were made, and consequently the trial judge had no opportunity or chance to make any remark to the jury on them, but as we read it under the whole thing there is nothing prejudicial to the plaintiff in error.

In his argument the District Attorney General made the statement to the jury that the thing which enabled the plaintiff in error to maintain a ''sphinx like'' countenance was the same thing that caused her to think that her husband was trying to put her in an asylum. Later in his argument he stated in effect that for two hours counsel for the plaintiff in error had engaged in a tirade of vilification of every witness who had testified for the State. It is argued that this was prejudicial error because it was a statement of a member of the prosecuting staff and would have great effect on the jury and it was not proper for the District Attorney General to make such a statement in argument to the jury. Of course we do not approve of arguments of the kind but in the heat of trial where counsel have been bantering back and forth throughout several days of trial it is perfectly human and natural that they make assertions of the kind.

Sometimes the adjectives they use in describing the other methods is somewhat an exaggerated term. We must look at it here as a jury of fair and honorable men and women who have heard the evidence and who will take the charge of the court as the law of the case. There is no complaint about the charge of the court in this instance at all. Unless there is something to show us that a thing of this kind is prejudicial to the plaintiff in error we must assume that the jury accepted the law as given to them by the court and disregarded arguments of the kind and realized that they were made in the heat of argument.

These same statements go to the assignments here about the District Attorney General's argument of the fact that special counsel and counsel representing the plaintiff in error were paid but that he was just a servant of the great State of Tennessee and was not getting any money, had no personal interest in the outcome of the case. The same comment applies to this argument as last above said. There is nothing particularly improper or prejudicial about it.

It is also complained that the District Attorney General in his argument of the case made statements of fact that were not introduced in evidence. There is no objection to any of these statements or arguments of this kind that the District Attorney General was making, there was no objection to the court at the time to making such statements, as a matter of fact on most of these instances the District Attorney General and counsel for the plaintiff in error were still bantering back and forth as to what was said or what was not said. Neither party addressed themselves to the court for a correction of this at the time. This is one of the assignments that comes up after

the case is over with. We think that a good many of these facts here, which are all mixed in with what the District Attorney General says, was part of the evidence. There are some other statements that were made in this connection or inferences which might be drawn from this evidence. In other words this was purely a very heated argument after many days trial of an important lawsuit. There was nothing detrimental or prejudicial as we see it to the plaintiff in error in such argument.

Then it is assigned as error that a new trial should have been granted because of newly discovered evidence. This newly discovered evidence is an affidavit setting out what a witness saw—he said that he saw the deceased about noon on June 20, 1956, the day before his body was found at his home. This was likewise testified to in the course of the trial by another person and this affidavit is purely accumulative and is not newly discovered evidence. Under such a situation this does not constitute a ground for a new trial. *Crittendon v. State,* 157 Tenn. 403, 420, 8 S.W. 2d 371.

Astute counsel have in these last few assignments picked out various things from arguments of counsel, which if treated by themselves and we did not have the whole context or the whole picture before us, might be error, but when we take the whole context from the beginning to the end of the trial statements of the kind in view of everything else that has gone forward in it, we think it is harmless and is not erroneous under the circumstances.

As said in the outset this case has been exceptionally well presented by both sides. The plaintiff in error was represented by two or three of the State's

ablest lawyers. They have done all that can humanly be done for her. She has had a fair trial. The writer of this opinion has enjoyed working on the case for this reason. We, after various conferences about it and after considering the matter feel unquestionably that the circumstances as proven and shown to us exclude every other reasonable hypothesis and that the jury were warranted in so concluding. In other words we cannot see how a jury could have arrived at any other conclusion than that of the guilt of the plaintiff in error under the facts and circumstances shown in this case. It is for this reason that the judgment below must be affirmed.