# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### OCTOBER 1999 SESSION



**FILED**

**December 20, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | |
|---|---|
| **STATE OF TENNESSEE,** | ) |
| Appellee, | ) **C.C.A. NO. W1999-01920-CCA-R3-CD** |
| | ) |
| VS. | ) **HENRY COUNTY** |
| | ) |
| **STEVEN ANDREW WHITE,** | ) **HON. JULIAN P. GUINN,** |
| | ) **JUDGE** |
| Appellant. | ) |
| | ) (First-Degree Murder) |

FOR THE APPELLANT:               FOR THE APPELLEE:

**GUY WILKINSON**                          **PAUL G. SUMMERS**
District Public Defender                  Attorney General & Reporter

**W. JEFFERY FAGAN**                     **R. STEPHEN JOBE**
Asst. District Public Defender         Asst. Attorney General
117 North Forrest Ave.                    Cordell Hull Bldg., 2nd Fl.
Camden, TN 38320                         425 Fifth Ave., North
                                                      Nashville, TN 37243-0493

                                                      **ROBERT RADFORD**
                                                      District Attorney General

                                                      **STEVE GARRETT**
                                                      Asst. District Attorney General
                                                      P.O. Box 686
                                                      Huntingdon, TN 38344

OPINION FILED:_____

**AFFIRMED**

**JOHN H. PEAY,**
Judge

## **O P I N I O N**

The defendant was found guilty by a jury of first-degree murder and sentenced to life imprisonment. The defendant's subsequent motion for a new trial was overruled by the trial court. The defendant now appeals and contends that the evidence is insufficient to support his conviction. After a review of the record and applicable law, we find no merit to the defendant's contentions and thus affirm the judgment of the trial court.

The State's proof at trial revealed that on February 27, 1998, the defendant drove a group of adolescents to a local skating rink. After dropping off several of the passengers, the defendant, Carl Denton, and Brian Beecham proceeded toward a local movie theater. After a brief stop at the movie theater, the defendant drove past the victim's place of employment, Fuel Pro, and then to a nearby cemetery. Mr. Denton, a foster brother of the defendant, testified that after they passed Fuel Pro and saw that the victim was working, the defendant stated that he was going to shoot the victim. According to Mr. Denton, the defendant had reiterated his intent to hurt or kill the victim for several months prior to that evening. Mr. Beecham, also a foster brother of the defendant, testified that the defendant told him at school earlier that day that he was going to "take care of business tonight" followed by "bang bang bang." In addition, Crystal Roberts, the defendant's girlfriend at the time, testified that earlier in the month the defendant stated that he was going to kill the victim with a gun that was under a seat in his car. The defendant further told Ms. Roberts that he obtained the gun from his father and that his father wanted him to kill the victim. The defendant alleged that the victim was continuously beating Tabitha, the defendant's cousin and the victim's adopted daughter, and her mother, Shirley Jean, the victim's wife.

According to Mr. Beecham, while en route to the skating rink, the defendant mentioned a bag in between the car seats with a gun in it. The defendant told Mr. Beecham he was "going to do it." When Mr. Beecham asked the defendant to drop him off, the defendant asked him if he was getting scared. Mr. Beecham replied that he

wanted to leave and the defendant subsequently took him to the skating rink and let him out of the van.

After leaving Mr. Beecham at the skating rink, the defendant and Mr. Denton returned to the cemetery and parked the van. Mr. Denton testified that the defendant started talking about how he was going to kill the victim. The defendant then retrieved a bag from inside the van and pulled out camouflage clothing, gloves, and shells. The defendant changed into the camouflaged clothing, put a stocking over his face, and left the van at approximately 7:50 p.m. to 8:00 p.m. The defendant was wearing a pair of black and white Reebok tennis shoes. At approximately 8:32 p.m., Mr. Denton heard two gunshots. At 8:35 p.m., Mr. Denton heard the defendant running toward the van breathing heavily. The defendant took off the camouflaged clothing, changed into casual clothing, and put the camouflaged clothing behind a nearby tombstone. After the defendant drove away from the cemetery, he told Mr. Denton, "I did it." He then proceeded to describe the shooting. He told Mr. Denton that he had shot the victim in the back of the head, the victim fell to the ground, and he had shot him again in the back of the head.

The defendant and Mr. Denton then returned to the skating rink. Ms. Roberts testified that she had seen the defendant after he had returned to the skating rink. She testified that the defendant was acting nervous, shaking violently, sweating and "just not his self." Mr. Beecham testified that, upon returning to the skating rink, the defendant had said that he had taken care of business and shook Mr. Beecham's hand. According to Mr. Beecham, the defendant was paranoid and perspiring. When Mr. Beecham asked the defendant what he had done with regard to his clothing and the gun, the defendant said that the clothing was behind a tombstone and indicated with a hand gesture that he had thrown the gun somewhere. Another witness, Joshua Henson, was also present at the skating rink when the defendant returned. Mr. Henson testified that earlier in the week the defendant had said he was going to move to Florida because he had "some business to take care of about a man." The defendant stated that this man had been hurting the defendant's family. Mr. Henson testified that at the skating rink,

3

the defendant had pulled him aside and said he had just done it.  Mr. Henson asked the defendant if he had just killed "him" and the defendant responded affirmatively.  According to Mr. Henson, the defendant appeared calm.

The defendant and Mr. Denton subsequently left the skating rink and proceeded to the defendant's father's trailer.  According to Mr. Denton, the defendant's father, J. B. White, arrived within minutes.  Mr. White then took the defendant and Mr. Denton into a bedroom and the defendant told Mr. White the victim was dead.  According to Mr. Denton, the defendant was to receive a 9mm handgun and one thousand dollars ($1000) from Mr. White for the murder.  Mr. White told the defendant and Mr. Denton to go to Murray as an alibi.  They took Mr. White's truck and went to the Wal-Mart in Murray and walked around for awhile.  On their way back to Mr. White's trailer, the defendant told Mr. Denton that this was an experience he had never felt before and his ears were still ringing.  When they returned to the trailer, Mr. White told Mr. Denton to retrieve the defendant's tennis shoes from the van and to put them in the creek behind the trailer.  Mr. Denton buried the shoes behind the trailer and later drew a map from which the police were able to retrieve the shoes.  Mr. Denton testified that he had found out later that the defendant had gone back to the cemetery to retrieve the camouflage clothing.

Jason Mobley, a friend of the defendant, testified that on February 28, 1998, the day after the murder, the defendant had told him that he had shot the victim.  The defendant told Mr. Mobley that he had parked somewhere behind Fuel Pro, walked down a hill behind the station, stood behind the station for approximately one hour, waited for a customer to leave, and then followed the victim inside the station.  The defendant further stated that he had shot the victim twice.  The defendant later admitted to Mr. Mobley that he had put the clothes and the weapon used in the commission of the offense behind a tombstone.

Mr. Henson testified that on the day after the murder he had seen the defendant at Patriot's Corner and the defendant had stated he "had to go get rid of some stuff."  The Monday following the murder, the defendant approached Mr. Henson at

school and asked whether he was aware of the reward being offered with regard to the victim's murder. When Mr. Henson responded affirmatively, the defendant stated, "Well, I'll tell you one thing, I've done it once, I won't be afraid to do it again."

At trial, the State presented two witnesses that were at Fuel Pro on the night of the murder. These witnesses established the victim's time of death between 8:30 p.m. and 8:40 p.m. The owner of Fuel Pro testified that an account had been taken of the money and receipts from that evening and no money had been stolen.

Testimony of police officers at the scene on the night of the murder established that footprints were discovered behind Fuel Pro leading to the station at a walk and leaving the station at a run. Subsequent testing of the design of these footprints revealed that six of the seven footprints were consistent with the size, shape, and tread design of the pair of Reebok tennis shoes that the police found buried behind the defendant's residence with the help of a map drawn by Mr. Denton. The police also found a significant amount of camouflage clothing and two guns, a revolver and a 9mm, in the defendant's residence. Donald Harman, a forensic scientist with TBI, testified that the bullet fragments found in Fuel Pro and the bullet core and bullet jacket found in the victim could have been fired from the revolver found in the defendant's residence. Dr. Wendy Gunther performed the victim's autopsy and testified that the victim had died as a result of a single gunshot wound to the back of his head. However, another bullet had passed right in front of the victim's eyes without striking him. This bullet left "stippling" on the victim's skin indicating that the gun was fired from a distance of a few inches to a few feet. Dr. Gunther was unable to conclude the order in which the bullets were fired.

The defendant did not testify and presented no other proof at trial.

The defendant now challenges the sufficiency of the evidence for the first-degree murder conviction. Specifically, the defendant points out that the investigation of this case with regard to his own father's involvement is ongoing. The defendant also mentions that the murder weapon was never found, no one testified that they saw the

5

defendant with a gun on the night of the murder, and no one saw the defendant shoot the victim. Further, the defendant refers to discrepancies between the testimony of several witnesses and the fact that evidence regarding footprints behind the Fuel Pro was not conclusive.

A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

We note that guilt may be predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Carey,

6

914 S.W.2d 93, 95 (Tenn. Crim. App. 1995); see also State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992) (holding that the necessary elements of first-degree murder may be shown by circumstantial evidence). In addition, the jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); Pruitt v. State, 460 S.W.2d 385, 391 (Tenn. Crim. App. 1970).

In the case at bar, with no eyewitnesses to the offense, a significant amount of the evidence connecting the defendant with the victim's murder is circumstantial. However, looking at the facts in the light most favorable to the State, as is required on appeal, we conclude that the evidence is more than sufficient to support the jury's finding of guilt beyond a reasonable doubt. There was evidence that the defendant believed the victim was beating Tabitha, the defendant's cousin, and Shirley Jean, Tabitha's mother. The defendant told Mr. Beecham and Mr. Henson he was going to "take care of" the victim. The defendant told Ms. Roberts and Mr. Denton he was going to kill the victim. On the night of the murder, the defendant told Mr. Beecham and Mr. Denton that he had a gun in the van. After taking Mr. Beecham to the skating rink, the defendant drove to a cemetery near Fuel Pro, changed clothing, put a stocking over his face, and left the van. Mr. Denton heard two gunshots at 8:32 p.m. and two other witnesses placed the victim's death between 8:30 p.m. and 8:40 p.m. At 8:35 p.m., Mr. Denton heard the defendant running toward the van. The defendant then hid the camouflaged clothing and gun behind a tombstone. The defendant drove to the skating rink and subsequently told Mr. Beecham and Mr. Henson that he had just killed the victim. The defendant later told Mr. Denton that he had never experienced this kind of feeling before and his ears were still ringing. The evidence indicated that the defendant was to receive one thousand dollars and a 9mm from his father for the murder. The day after the murder, the defendant told Mr. Mobley that he had killed the victim and proceeded to tell Mr. Mobley the details of the murder. According to the defendant's own statement to Mr. Mobley, he parked somewhere behind Fuel Pro, walked down a hill, stood behind the station for

7

about an hour, then followed the victim inside after a customer drove away. The defendant stated that he had gone inside, shot the victim twice, and then had gone back up the hill where Mr. Denton was waiting in the van. The footprints found behind Fuel Pro on the night of the murder were consistent with the tread, shape and size of shoes found buried behind the defendant's residence. In addition, camouflaged clothing was found inside the defendant's residence along with a revolver that could have fired the bullets used in the victim's murder.

Based upon the facts in the record and the inferences which could be drawn therefrom, the jury could and did find that the defendant was guilty of first-degree murder. The defendant has failed to demonstrate that the evidence is insufficient to support the jury's verdict.

Accordingly, the judgment of the court below is affirmed.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
NORMA M. OGLE, Judge

_____
ALAN E. GLENN, Judge