IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

DECEMBER 1999 SESSION

FILED

February 2, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # W1998-00002-CCA-R3-CD |
| Appellee, | * | SHELBY COUNTY |
| VS. | * | Hon. Chris Craft, Judge |
| MICKEY JEFFRIES, | * | (Felony Murder) |
| Appellant. | * | |

For Appellant:

Tony N. Brayton
Assistant Public Defender
201 Poplar Avenue, Suite 2-01
Memphis, TN 38103
(on appeal)

William C. Moore, Jr.
Assistant Public Defender
201 Poplar Avenue, Suite 2-01
Memphis, TN 38103
(at trial)

OF COUNSEL:

A. C. Wharton, Jr.
Shelby County Public Defender

For Appellee:

Paul G. Summers
Attorney General and Reporter

J. Ross Dyer
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243

Jerry P. Kitchen
and
Amy P. Weirich
Assistant District Attorneys General
Shelby County District Attorney
  General's Office
201 Poplar Avenue, Third Floor
Memphis, TN 38103

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

OPINION

The defendant, Mickey Jeffries, was convicted of felony murder. The trial court imposed a life sentence. In this appeal of right, the defendant challenges the sufficiency of the evidence.

We affirm the judgment of the trial court.

On July 15, 1996, the victim, Debra Thornton, went to Sweet's Lounge in Memphis with her boyfriend, Adrian Lucero. The victim had in her possession two Valium and two Loratabs which she had been given by her mother, Angela Thornton. While sober at approximately 8:00 P.M., when the victim and Lucero left the residence, the victim had been drinking beer. She and Lucero walked to Sweet's Lounge where they played pool. Over a four-hour period until approximately 1:00 A.M. the next morning, the victim and Lucero each consumed a six-pack of beer. During that time, Lucero did not see the victim take any of the pills she had in her possession. Lucero acknowledged that he had had an argument with the victim while at Sweet's Lounge but denied any physical altercation. Upon leaving the lounge, the couple walked hand in hand to a Mapco Express. While the victim went to the women's restroom, Lucero went to the men's. When he walked out of the restroom, however, the victim was not in the store. Betsy Sue Bradley, an attendant, had seen the victim emerge from the restroom and walk out of the store a minute or less before Lucero returned from the restroom. Bradley described the victim as being "kind of loud," "staggering," and "a little bit drunk." Lucero, who testified that he looked for the victim, was unable to find her and returned to the Thornton residence at 1:00 A.M.

Thomas Rakestraw, who "got into a conflict with my roommates," had "stashed my stuff behind Labor Ready there on Summer Avenue by the air-conditioning unit," and gone to sleep in a sleeping bag located under a canopy. Asleep since about 10:00 P.M. on July 15, Rakestraw was awakened between 2:30 and 3:00 A.M. the following morning by a "scuffling noise" and "glass breaking." He

2

then heard a female say, "Hold on, wait a minute. I can't breathe." Rakestraw, who was upset by being awakened, remembered a "strangling voice, you know, like she was struggling a little bit, but it didn't sound like [an] emergency to me...." He recalled that the last thing he heard before taking a walk to the Mapco was a female voice stating, "I can't breathe." Rakestraw, who had been drinking beer before falling asleep, ate something at the Krystal and smoked a couple of cigarettes before returning to go to sleep about 30 or 45 minutes later. He awoke at approximately 5:45 A.M. and was awaiting his ride to work when he saw the defendant, holding his shoes in his hands, get out of a truck. The defendant approached Rakestraw and said, "Man, if you want some p----, she's still asleep." Rakestraw answered, "No, man, you're crazy," after which the defendant said, "You seen nothing. You ain't seen nobody. You ain't seen me at all. That's between me and you. You ain't seen me." Rakestraw recalled that the defendant then walked quickly away, "like a little jackrabbit." As Rakestraw walked to meet his ride, he glanced inside the truck and was able to see the victim's legs. He testified that he "just kept walking [and] didn't pay it no attention [and] caught my ride and went on to work." Rakestraw recalled that he had seen the defendant four or five times earlier and was able to identify him at trial.

The police discovered the body of the victim in a 1968 Chevrolet truck owned by William Dickerson, a roofing contractor, who had parked the vehicle at Labor Ready on Summer Avenue. When Dickerson arrived at the vehicle between noon and 1:00 P.M., several hours after the murder, he found that the windshield had been cracked since he had last seen it.

Police Captain Frederick Sansom testified that the victim was on her back in the front of the truck. Her jeans and underwear had been pulled down and her sweater was pushed up revealing her breast. The victim's watch and a broken beer bottle were found four feet from the truck.

Captain Raymond J. Warr of the Memphis Police Department assisted

3

in the investigation. When questioned six days after the death of the victim, the defendant told Captain Warr that he did not kill the victim. The defendant claimed that he had met Lucero and the victim on the morning of her death. The defendant told Captain Warr that he asked Lucero, who he believed to be intoxicated, for a light. He claimed that Lucero loudly replied, "Don't ask me for s---." The defendant, who said he did not notice any blood on the victim, told Captain Warr that the victim voluntarily got into his truck and consented to sex. He claimed that he and the victim had arranged beforehand to smoke crack cocaine together and that she had agreed to "ditch her boyfriend." He stated that she performed oral sex in exchange for the cocaine and then gave him $20.00 to buy some more. He said that he remembered the guy who was trying to sleep in front of the truck "asking me what was the hell going on." The defendant claimed that he and the victim smoked "four or five rocks as twenties." The defendant told police that he gave Rakestraw $1.25 so that Rakestraw could go purchase a beer, but denied saying to him, "If [you] want ... some p----, [you] could go get some...."

On September 2, 1996, about six weeks after the crime, the defendant gave another statement to Lieutenant E.R. McCommon. In his statement to Lieutenant McCommon, the defendant admitted that he had not been truthful with Captain Warr. He told Lieutenant McCommon that he had exchanged cocaine with the victim for oral sex and that the two then had sex. He claimed that she began to "freak out ... kicking the truck windshield and some more stuff." He stated that she acted "wild-like," as if "she was getting off, and all of sudden, she just got calm, and her body went limp." On this occasion, the defendant said that the victim did not smoke any crack cocaine before they had sex, but stated that she was drinking in the truck. He claimed that before leaving, he told Rakestraw (whose name he did not know) "that something was wrong with that female in the truck."

On September 4, two days after his statement to Lieutenant McCommon, the defendant gave a third statement to Sergeant A.J. Christian. He acknowledged having lied in his initial two statements. In his third statement, the

4

defendant made the following admission:

> I failed to demonstrate on how the individual died. At the time we were in the truck, the way that my body was lying on hers, I believe that she was not getting enough oxygen and as I was carrying on having sex with her, I didn't realize that I was hurting her, as far as killing her. ...I knew I had done something in some shape, form, or fashion of killing her. I didn't' mean to, but it just seemed to happen that way without me knowing it myself.

The defendant also acknowledged that the victim had told him that she could not breathe. He recalled that his "chest was in her face" while they had intercourse. The defendant also conceded that the victim asked him "to get up because her boyfriend was looking for her and we also heard her boyfriend calling for her."

Dr. Wendy Gunther, a forensic pathologist, performed the autopsy. At trial, Dr. Gunther testified that the victim had abrasions on her upper and lower lips and a tooth "that's been half knocked out of its socket." She found blood in the victim's mouth and on her neck and shoulders. Dr. Gunther testified that the injuries occurred while the victim was alive. She also found scrape marks on the tip of her nose and her chin and prominent blood vessels in her eyes, one of which had "popped." Dr. Gunther found no evidence of strangling but did find acid phosphatase, "an absolute guarantee that the woman has had sex with a man." Blood alcohol content of .15 gram indicated that the victim was "fairly drunk." Dr. Gunther found that the victim had taken Valium, Equinem, Hydrocodone, and Tylenol. There were no traces of cocaine. Dr. Gunther concluded that the victim died due to a "combined asphyxia or inability to get oxygen into her due to pressure against the mouth and the position that her body was in." Photographs taken at the scene, which showed the victim with her head pressed against the door of the car and the remainder of her body as almost horizontal, supported her opinion. In her view, the position of the victim was not enough to kill her by itself. She believed that pressure against her mouth was the other contributor to the death. Dr. Gunther stated that unconsciousness to death required a minimum of two and one-half minutes to as much as five minutes. On cross-examination, Dr. Gunther admitted that she had filed the certificate of death on August 13, 1996, some three weeks before she made her final conclusions. In her initial certificate, she listed the cause

of death as cardiac arrhythmia or irregular heartbeat.  She explained as follows:

> [W]hen I first looked at [her] body, I was not at all sure
> why she had died.  I had not seen the scene photos
> when I first examined her body.  They had not yet been
> developed, and I did know what had caused her to die.
>
> I took a picture of the burst blood vessel in her eye, and I
> took a picture of the white area around her mouth, but it
> had not yet been come clear to me how these things
> went together.  So at that time I left the cause of death
> pending.  Presently, on consultation with other forensic
> pathologists, I felt that it was necessary to sign a death
> certificate.  So I signed the first death certificate cardiac
> arrhythmia due to unknown ideology, which is doctor talk
> for irregular heartbeat for no cause that we understand....
>
> But signing a death certificate enables the family to deal
> with the aftermath of a death.  When I sign a certificate, I
> always know that I can change it if further evidence
> comes to light or if I understand what [has] happened.

Dr. Gunther testified that she did not believe that she had seen the defendant's second (September 4) statement at the time she amended her death certificate showing the cause as asphyxia due to smothering or positional asphyxia.

The defendant complains that the state's case is based entirely upon circumstantial evidence.  He argues that the evidence of relatively minor injuries to her face and the crack to the windshield of the truck were insufficient to support the theory of the state that the victim was being raped at the time of her death.  In summary, the defendant argues that the evidence presented, including all reasonable inferences, failed to unerringly point the finger of guilt.

An offense may be proven by circumstantial evidence alone.  Price v. State, 589 S.W.2d 929, 931 (Tenn. Crim. App. 1979).  Our scope of review is the same when the conviction is based upon circumstantial evidence as it is when it is based upon direct evidence.  State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961).

In convictions such as these, where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence.  There must be an evidentiary

basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). The trial court has the duty to charge the jury on the weight and significance of circumstantial evidence when it is the only basis upon which the state's case rests. Bishop v. State, 287 S.W.2d 49, 52 (Tenn. 1956). Like all other fact questions, the determination of whether all reasonable theories or hypotheses are excluded by the evidence is primarily a jury question. Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); State v. Tharpe, 726 S.W.2d 896 (1987).

The jury is governed by four rules when testing the value of circumstantial evidence: (1) the evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; and (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. Marable, 313 S.W.2d at 456.

Even when our scope of review is so limited, however, there is precedent for overturning verdicts which are not supported by sufficient circumstances:

> In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt....
>
> * * *
>
> We cannot speculate a defendant into the penitentiary or permit a jury to do so.

State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971).

Here, however, there was proof that Lucero and the victim walked hand in hand to Mapco and thus no indication that Lucero was violent to the victim at anytime before she left the Mapco Express. Lucero denied having seen the

7

defendant on the night of the victim's death, testimony that the jury was entitled to accredit, despite the defendant's claim to the contrary. There was medical evidence that the victim had injuries to her mouth and that a tooth had been knocked out. There were abrasions to the nose and chin and a ruptured blood vessel. Lucero had confirmed that there was no injuries to the victim when she disappeared on the morning of her death. Dr. Gunther also testified that the blotching of the face of the victim had been caused by something firmly pressed in the area of her mouth at the time of her death. Asphyxia was established as the cause of death. Absent the pressure, it was Dr. Gunther's opinion that the victim would have survived. There is nothing other than the testimony of the defendant to indicate that there was consensual sex. Injuries to the victim indicate otherwise. Rakestraw testified that he heard a struggle, a "scuffling noise," and "glass breaking." There was no prior relationship between the victim and the defendant. The victim was engaged to Lucero at the time of the offense. Had the sexual activity been consensual, there would have been little need for the defendant to cover the mouth of the victim or cause any of her injuries. A broken beer bottle lay four feet from the truck. The victim's watch was found in the same place. Dr. Gunther testified that the blunt trauma to the victim could have been inflicted by an object such as a beer bottle. That the defendant was untruthful in his first and second statements made to the police raises a strong inference of guilt. Each time he talked to police, he provided new facts which tended to further incriminate him. For example, he initially claimed that the victim ingested cocaine. Medical evidence refuted that. In his first statement, he implied that the victim was unharmed when he left her. By his last statement, he acknowledged that she could not breathe and had "done something" to cause her death. From all of this, it is our view that the evidence, while not in the least overwhelming, was sufficient to establish that the victim died during the perpetration of a rape. See Tenn. Code Ann. § 39-13-202(a)(2).

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Presiding Judge

8

CONCUR:


_____
John Everett Williams, Judge


_____
Norma McGee Ogle, Judge