IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2002

**STATE OF TENNESSEE v. MARCUS WEBB**

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 01-01362, 63     Carolyn Wade Blackett, Judge**

---

**No. W2002-00614-CCA-R3-CD** - **Filed January 29, 2003**

---

The defendant, Marcus Webb, was convicted by a Shelby County jury of two counts of aggravated robbery. On appeal, he challenges the sufficiency of the evidence and the trial court's jury instruction defining the *mens rea* of "knowing." We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

W. Gary Ball and Jane Sturdivant (at trial), and William D. Massey and C. Michael Robbins (on appeal), Memphis, Tennessee, for the appellant, Marcus Webb.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen C. Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On September 21, 2000, shortly after midnight, Wendy's employees Kesha Paige and Brad Fifer were closing the restaurant located on Shelby Drive in Memphis. As they walked out the back door, a man wielding a silver pistol forced them back inside. The perpetrator was wearing a stocking cap over his head and face and wore dark clothing. The perpetrator made Paige lie on the floor in the restaurant's office, while Fifer was forced to open the safe and put all the money in a blue backpack furnished by the perpetrator. The perpetrator exited the restaurant with approximately $3,000 in bills and coins in the backpack.

Deputy Michael Norton of the Shelby County Sheriff's Department was patrolling Shelby Drive about this time. He observed the defendant walking across the street, and it appeared the defendant was coming from Wendy's. The defendant was dressed in dark clothes, had a blue backpack and was wearing brown gloves. Unaware of the robbery at this time, Deputy Norton asked the defendant where he was going. The defendant replied his car had quit around the corner, and

he tried to get power steering fluid at Mapco, which the evidence showed was located on the same street as Wendy's several hundred yards away. The defendant stated Mapco was closed. Deputy Norton became suspicious; he knew Mapco was open all night. The defendant informed Deputy Norton that his driver's license was suspended, and he gave the license to Deputy Norton. Deputy Norton retained the license and followed the defendant to his car, which was parked in a residential area just around the corner. The defendant placed the backpack in the defendant's car.

The defendant opened the trunk of his car where it appeared to Deputy Norton that the defendant got a funnel and "some kind of liquid." The defendant then opened the hood of his car and appeared to pour something through the funnel, although Deputy Norton did not believe he actually poured anything into the automobile. Deputy Norton informed the defendant that Mapco was open all night, and he would follow him to Mapco where the defendant could purchase more fluid.

The defendant drove toward Mapco, and Deputy Norton followed some distance behind. As Deputy Norton approached a stop sign, he observed on the ground what appeared to be the same blue backpack carried by the defendant. Deputy Norton placed the backpack in the patrol car without looking in it.

While en route to Mapco, Deputy Norton observed the commotion at Wendy's and learned of the robbery. He proceeded to Mapco where he took the defendant into custody. The defendant had a pistol magazine clip in his pocket, but the officer was unable to find a weapon. According to Deputy Norton, the defendant denied that he had a pistol and did not inform him of the location of a pistol that used the magazine clip. Deputy Norton opened the backpack he had retrieved and found numerous bills and coins in it.

John R. Bell, a Mapco employee, testified that he first saw the defendant at approximately 1:00 a.m. when the defendant asked for change to use the pay phone. The defendant returned a short time later, and Bell encountered him reaching into a garbage can. It appeared to Bell the defendant was holding clothes or some kind of "cloth item" in his hand. The defendant immediately handed Bell $2.00, asked for gas and proceeded around the side of the building. According to Bell, the defendant did not purchase any power steering fluid. Bell testified the defendant seemed nervous on both occasions while at Mapco.

Deputy Norton then appeared at Mapco and took the defendant into custody. Subsequently, the defendant's brown glove was found in the trash can and a sweater shirt was found at the corner of the Mapco store. Deputy Norton identified the shirt as the one worn by the defendant.

Montel Tidwell lived in the residence near Shelby Drive where the defendant parked his car. She observed the car parked in front of her residence for a substantial period of time and became suspicious. Later, she observed the deputy at the location with the defendant and observed the defendant throw something out of his car when he drove off. Subsequently, a stocking cap was found at this location. Kesha Paige stated the stocking cap appeared to be similar to the one worn by the perpetrator.

Shortly after the defendant's apprehension, Kesha Paige was shown the defendant's driver's identification photo. She did not believe it looked like the perpetrator, but also testified the picture did not look like the defendant as he appeared in the courtroom. However, Paige subsequently picked the defendant from a photo lineup at the police department, saying the photo "looks like" the perpetrator. She testified that although the defendant's face was mostly covered, she could observe that he had "fat jaws."

Brad Fifer testified for the defense. He testified that although he picked the defendant's photo in a photo lineup after being told by the officers the defendant was the perpetrator, the perpetrator did not match the physical appearance of the defendant. Fifer believed the perpetrator was taller than the defendant and had a bigger "belly." During cross-examination the state sought to impeach Fifer. Fifer insisted that he did not know the defendant, although the defendant apparently lived in the same neighborhood as Fifer's mother.

The defendant testified in his defense. He stated that he called his girlfriend from Mapco during his first visit there and was en route to his girlfriend's residence when he experienced the power steering problem. He said that he parked the vehicle in the residential neighborhood; however, contrary to Montel Tidwell's testimony, he stated it was there for only a short time. He said he walked back to Mapco to purchase the fluid; however, Mapco appeared closed. He stated that he was returning to his automobile when he was stopped by the deputy. He denied that he had a backpack in his possession and denied that the sweater shirt found at Mapco belonged to him. Contrary to Bell's testimony, the defendant contended he indeed bought fluid at the Mapco prior to his arrest. He conceded throwing the glove in the garbage can, explaining the glove had fluid all over it. The defendant testified the magazine clip went with a gun he had recently purchased, and the gun was located at his residence. According to the defendant, he informed the officers of this, but they did not go to his residence to secure the gun. The gun was not produced by the defendant at trial, nor did the defendant's girlfriend testify.

## SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence against him is circumstantial and is legally insufficient to support the guilty verdicts. We disagree.

Although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). However, in order for this to occur, the circumstantial evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. Tharpe, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." Id. (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

While following the above guidelines, this court must remember that the jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958); *see also* Gregory, 862 S.W.2d at 577; State v. Coury, 697 S.W.2d 373, 377 (Tenn. Crim. App. 1985); Pruitt, 460 S.W.2d at 391.

The sole issue raised by the defendant as to the sufficiency of the evidence is whether the defendant was proven to be the perpetrator. Kesha Paige was able to identify certain physical features of the perpetrator although he had the stocking cap over most of his face. She identified the defendant's photo as looking like the perpetrator. She described the backpack used by the perpetrator and identified the stocking cap found near the residence as being similar to the one worn by the perpetrator.

Deputy Norton observed the defendant shortly after the robbery crossing the street near Wendy's in clothing similar to that described by Paige. The defendant possessed a blue backpack which the deputy subsequently discovered by the road on the route driven by the defendant. The backpack had numerous bills and coins in it. Deputy Norton identified the shirt found at the corner of the Mapco store as the one previously worn by the defendant. A magazine clip was found in the defendant's pocket.

Although the defendant denied his participation in these offenses and produced testimony from Brad Fifer who questioned whether the defendant's appearance matched that of the perpetrator, it was for the jury to determine whether the circumstances were consistent with guilt and inconsistent with innocence. *See* Marable, 313 S.W.2d at 457. The evidence was sufficient to support the jury's verdict.


## "KNOWING" *MENS REA*

Finally, the defendant contends the trial court erred in defining the "knowing" *mens rea* for the offense of aggravated robbery. We envision no reversible error.

The *mens rea* for robbery is either "intentional or knowing." Tenn. Code Ann. § 39-13-401(a). In its jury instructions, the trial court stated the following:

> "Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*See* Tenn. Code Ann. § 39-11-106(a)(20). The defendant contends aggravated robbery is a result-of-conduct offense, and the jury instruction erroneously authorized the jury to find guilt based upon the defendant's awareness of the nature of his conduct or circumstances surrounding his conduct.

The defendant relies upon State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002). In Page, this court concluded second degree murder was a result-of-conduct offense. *Id.* at 783. We further concluded that a jury instruction which authorized a conviction for this offense based upon the defendant's awareness of the nature of his conduct or circumstances surrounding his conduct was erroneous. *Id.* We also concluded the error was not harmless because the crucial issue at trial was the defendant's *mens rea. Id.* at 789-90.

Unlike murder, we do not consider robbery and aggravated robbery result-of-conduct offenses. The knowing *mens rea* of robbery refers to the "knowing theft." Tenn. Code Ann. § 39-13-401(a). The knowing *mens rea* of theft refers to "knowingly obtain[ing] or exercis[ing] control over the property." *Id.* § 39-14-103. The focus of the proscribed conduct is not upon its result. *See* State v. Tracy F. Leonard, No. M2001-00368-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 737, at *77 (Tenn. Crim. App. Aug. 28, 2002, at Nashville), *perm. to app. denied* (Tenn. Dec. 16, 2002). Regardless, the issue at trial was identity, not the *mens rea* of the perpetrator. The defendant was not prejudiced by the jury instruction. *See* Page, 81 S.W.3d at 789 (recognizing that a faulty *mens rea* instruction will be harmless error in many homicide trials). This issue lacks merit.

Based upon our review of the record, we affirm the judgment of the trial court.

JOE G. RILEY, JUDGE
