# LANCASTER *v.* THE STATE.

## (*Nashville.* February 27, 1892.)

1. **MURDER.** *Verdict for murder in first degree upon circumstantial evidence approved.*

   This Court approves the verdict for murder in first degree, with sentence of death, rendered in this case upon circumstantial evidence alone. The facts are fully set out in the opinion of the Court. (*Post, pp. 269–284.*)

2. **CHARGE OF COURT.** *Correct as to circumstantial evidence.*

   Court's charge in a murder case upon the subject of circumstantial evidence is correct in this language, viz.: "In order to warrant you in convicting the defendant in this case, the circumstances proven must not only be consistent with his guilt, but they must be inconsistent with his innocence, and such as to exclude every reasonable hypothesis but that of his guilt; for, before you can infer his guilt from circumstantial evidence, the existence of circumstances tending to show his guilt must be incompatible and inconsistent with any other reasonable hypothesis than that of his guilt." (*Post, p. 285.*)

3. **CRIMINAL PRACTICE.** *Oath of jury. Recital of.*

   The recital in an order impaneling jury in a felony case that the jurors were "elected, tried, and sworn well and truly to try the issues joined," shows a sufficient swearing of the jury without adding "and true deliverance make," or other words. (*Post, pp. 285, 286.*)

   Cases cited and approved: Fitzhugh *v.* State, 13 Lea, 260; Baxter *v.* State, 15 Lea, 657.

   Cited and distinguished: Hargrove *v.* State, 13 Lea, 179.

4. **SAME.** *Officer's oath sufficient. Recital of.*

   The recital in an order impaneling jury in a felony case that the officer in whose charge the jury were placed was "sworn as required by law" or "according to law," is sufficient without setting out the language of the oath administered. (*Post, pp. 286, 287.*)

   Case cited and approved: Taylor *v.* State, 6 Lea, 235.

   Cited and distinguished: Buxton *v.* State, 89 Tenn., 216.

5. SAME.  *Same.*

And this correct recital is not vitiated by recitals in subsequent respite orders that the jury returned into Court in charge of their officer "heretofore sworn to *keep them.*"  (*Post, pp. 286, 287.*)

6. SAME.  *Verdict not set aside upon defendant's unsupported affidavit.*

The verdict in a murder case will not be set aside upon the unsupported affidavit of the defendant, averring misconduct of jury upon information and belief.  (*Post, pp. 287, 288.*)

7. SAME.  *Same.*

Nor will such verdict be set aside because the Court refused to call the jurors, upon defendant's motion, to impeach their verdict upon the ground that they did not believe the defendant guilty.  Such affidavits cannot be heard by the Court.  (*Post, pp. 288, 289.*)

Case cited and approved: Hannum *v.* State, 90 Tenn., 647.

8. SAME.  *Court may disregard jury's finding of mitigating circumstances.*

The trial Judge may, in his discretion, disregard the jury's finding of mitigating circumstances in a murder case and refuse to commute the sentence from death to imprisonment for life.  Such action of the trial Judge is approved in this case.  (*Post, pp. 289, 290.*)

Code construed: § 6098 (M. & V.); § 5257 (T. & S.).

Cases cited and approved: Greer *v.* State, 3 Bax., 322; Lewis *v.* State, 3 Head, 127, 150.

---

FROM GILES.

---

Appeal in error from the Circuit Court of Giles County.  E. D. PATTERSON, J.

J. P. ABERNATHY for Lancaster.

Attorney-general PICKLE for the State.

CALDWELL, J.   Larkin Lancaster, the appellant, is under sentence of death for the murder of Zack Dixon.   He has been three times tried by Court and jury with same result.   The judgment of the Circuit Court has been twice reversed in this Court, and the case is now here for the third time.   A new trial is sought on several grounds. In the first place, it is contended that the conviction is not sustained by the evidence; that the proof shows neither the *corpus delicti* nor the identity of appellant as the murderer.

Zack Dixon, who is alleged to have been murdered, was a black negro boy, seventeen years of age, and residing on a farm near Pulaski, in Giles County.   He was last seen by the witnesses at his mother's house, and at other places in that county, on the first Sunday in November, 1888, and has not been heard from since his disappearance—after sundown of that day.   He expressed no purpose of leaving the county, made no preparations to leave, and no reason is shown why he should have done so.   He was an industrious, well-behaved boy, and left behind a matured cotton crop, some clothing, and other property, which he made no effort to dispose of in any way, and has never called for himself.

On the first day of December, some three weeks after the sudden and unexplained disappearance of Zack Dixon, the headless body of a male negro, about his size, was found near Hick's Bluff, two and one-half miles below Pulaski, in Richland

Creek, several miles from where he was last seen by the witnesses, the trunk, with arms attached, being confined by a piece of rope in one sack, and the severed legs tied up in another sack. In each sack was also a heavy rock, used as a sinker, and in the one containing the legs was a butcher-knife. One of these sacks was *tow* and the other *cotton*. An inquest was promptly held, and the body was viewed by numerous persons before interment.

This body, the State contends, was the body of Zack Dixon.

The coroner, some of his jurors, and many of the other persons who saw the body, were examined as witnesses in this case.

The head was never found; consequently, identification of the person was rendered more than ordinarily difficult.

The State endeavored to show that the headless body was that of Zack Dixon by means of certain articles of apparel and certain flesh-marks found upon it, and also by its general appearance; and upon all these points the prisoner endeavored to meet the effort of the State by such conflicting evidence as he was able to produce.

On the dead body, when taken from the water, was found a part of a plain, hand-sewed, domestic shirt, with sleeves "hemmed back at the wristband," because too long originally; and on one arm was a "leather wristband." About the presence of these articles on the body when rescued

from the creek, and their description, all the witnesses are agreed.

Millie Suggs, mother of Zack Dixon, testified that he "had two burnt places on the shin of his leg and a scar across the instep of his foot;" that she "saw the dead body, and knew it was Zack;" that she saw upon one leg and foot the scars which she knew were upon his person at those places; that she was "positive the dead body was that of Zack Dixon," her son; and, furthermore, that she made, with her own hands, the shirt Zack had on when he left her house late in the forenoon of the day, on which he was last seen alive, and knew the piece found on the dead body to be a part of that same garment; that she knew it by her "sewing, and the tuck on the wristband sleeve;" that she "made it with her fingers, and knew her sewing;" that she "turned back the wristband and hemmed it because it was too long;" that she made two shirts for him from the same piece of goods and by the same pattern. One of these garments he put on at her house in the forenoon of the day he disappeared; the other one she brought into Court for comparison with that taken from the dead body. "The sewing appeared to be the same on both," and they were alike in all respects, except the one found "on the body was a little larger in the collar," had "a little wider collar-band and plait," and was darker in color than the other one. This witness further said that she described

the scars upon her son's foot and leg and "the tuck in the sleeves" of the shirt before she saw the dead body; that the leather wristband found upon one of the arms "was the one Zack had on when he left" her house for the last .time; that "where the skin was on the body found, it was same color of Zack."

S. W. Beck, with whom Zack Dixon worked in 1888, testified that Zack left his house on Saturday before the first Sunday in November of that year to visit his mother, a few miles away, and return on Sunday evening; that for some unknown reason he did not return; that he knew Zack had a scar on instep of right foot, and another one on leg, having seen them when Zack was barefooted and had his "pants rolled up;" that he saw on the dead body in question "the same kind of scars, and in the same places;" that he was "satisfied it was the body of Zack Dixon from these scars," the leather wristband, and the "size of body and color;" that "Zack cut a piece of bridle-rein off of a blind-bridle of witness for a wristband," which he thinks is the same leather wristband found on the body; that "the body found was the body of Zack Dixon."

Mattie Dixon, a sister of Zack, says he "had a scar on leg and on foot, down on front;" that he put on clean shirt, made by their mother, the morning of the first Sunday in November, 1888; that the "wristband was turned over and whipped down;" that her "mother always did the shirts

that way when they were too long;" and that she thought she had seen the shirt found on the dead body before.

J. J. McCollum, the Coroner, testifies to the finding of the two sacks, and as to their contents, as hereinbefore stated, including the piece of shirt and the leather wristband. He says also that the body was that of "a black negro" man or boy; that he saw "some patches of black skin hanging" upon it; and that he "found an indenture or scar or crease on one foot," but "did not examine foot closely."

Caleb Osborne, one of Coroner's jury, says he saw "scar on the leg" of dead body; that Zack Dixon's mother described the scars, the shirt, and the hem on wristband before she saw the dead body; that they "found the shirt as she had said," and she identified it when she saw it; that the body was that of a "black negro man or boy," but presented a "light brown color where the skin was slipped off."

Dr. George D. Butler says he examined body at request of Coroner, and found on instep of "one foot either a scar or indentation made by a rock while in the sack," but "saw no scar on leg, * * did not look for any;" that "it was a black negro boy;" that "water had a tendency to cause the cuticle to slip off, and the outer skin had slipped off in many places."

Tom May, of Coroner's jury, says he saw no scars, and looked for none; that the general ap-

18—7 p

pearance of the body where cuticle had come off was "mulatto or yellow," but that it was "black" where no such change had taken place.

Ben Aymett says Zack had a "scar on instep and leg;" that he examined dead body, and, from its "color and size" and "scar on leg at same place," he thought it was Zack's body; that "it was a shade lighter" than Zack, but the "water had bleached it."

Dr. J. C. Roberts says he saw the body taken out of the creek; that "it was the body of a black negro;" that "the water made the body look ashy and pale somewhat."

Ed F. McKissack says the body had "black spots between the shoulders," and that "the outer skin had slipped off except in spots."

H. E. Butler says the body when taken out of the creek "was yellow," and that "Zack Dixon was black as a crow."

Dr. William Batt says "the skin of a negro consists of two main layers;" that "the coloring matter of the negro's skin is in the outer cuticle, and when that slips off it exposes the inner or true skin;" that "if a dead body be put in water for any length of time it makes the cuticle slip."

Touching the identity of the dead body, the prisoner examined six witnesses, the substance of whose evidence will next be given.

M. M. Maclin, who interred the body, says he examined it "closely for scars and found none;" that he examined both feet and legs particularly,

because he "had heard the mother of Zack say he had scars on his right leg and foot;" that. "body was the color of a mulatto."

Dr. W. A. Milhouse says he made the examination with M. M. Maclin; "examined both feet and legs particularly," and "found no scars;" and that he thinks "the body was that of mulatto."

Dr. C. A. Abernathy "saw no scars on the body," but "did not examine it closely;" says he thinks "it was the body of a mulatto," and that the skin was not off; that he does not think "soaking a black negro's body in water would change it" to the appearance "of mulatto without destroying skin."

Grant Butler says he "found no scars on foot or leg," but "did not examine body very carefully;" that it was of "mulatto color."

Sam Hopkins says the body was "lighter in color than Zack," but about his "size," and "of his appearance through the shoulders."

J. W. Judson says body was "bright mulatto," and "if the skin had slipped from body he did not notice it."

This evidence clearly establishes the *corpus delicti;* it leaves no room for reasonable doubt that Zack Dixon was murdered, and that the headless body found in Richland Creek was his body.

The identity is shown by the flesh-marks, the shirt, the leather wristband, and the color and size of the body.

That Zack Dixon had scars upon one foot and

leg is shown without contradiction. All the witnesses who saw these scars upon his living person, and who made examination, readily found scars of same character and location on the dead body. There were three of these witnesses—Zack's mother, Beck, and Aymett—and two other witnesses, without close examination, discovered a scar, or something like one, on one foot; and another one noticed a scar on one leg.

On the other hand, there are four witnesses who looked for scars and failed to find them. None of these, however, had seen the scars on Zack Dixon's body while living, and only two of them claim to have made a careful examination of the dead body. It is not strange that persons having seen the marks on the living body could more readily than other persons discover them upon the dead body.

The evidence about the shirt is of but little less potency. The day Zack Dixon disappeared he put on the shirt found upon the dead body, and wore it away from his mother's house. She identified the garment positively by the peculiar work of her own hands upon it, as well as by comparison with another one of the same kind and make. The peculiarity about the sleeves could not be mistaken. It was observed at once by those who saw it while on the dead body and afterward. That peculiarity she described, as she did the scars on her son, before she saw either the shirt or the dead body, and by that description one of the witnesses recog-

nized the shirt. He says they "found the shirt as she had said," and she promptly identified it. Her identification is not discredited, nor is its force weakened, by the fact that the shirt produced in Court, as of the same goods and pattern, was whiter than that found on the dead body, and not so large in the collar. She did not claim that the collars were of precisely the same size and make. Garments made by the same pattern frequently differ in such small particulars. The difference in color is well accounted for by the fact that one had been in water on a dead body, and the other had been "washed clean."

The proof about the leather wristband is likewise of marked importance, though in a less degree than that as to the flesh-marks and the shirt. That Zack Dixon had such an article on one of his wrists the day of his disappearance is clearly shown, and his mother says the leather wristband found on the dead body is "the one Zack had on when he" left her house that day. She states no mark or peculiarity by which she recognized it. She may have been mistaken.

Beck expresses the belief that this wristband is the same that he saw Zack Dixon make from a piece of bridle-rein belonging to witness, yet he does not identify it positively.

The dead body was of proper size and color for Zack Dixon. He was black, and all the witnesses who examined the whole of the dead body say it was black. Most of the witnesses who

speak of it, say it was of an ashy, yellow, or mulatto appearance, but this is manifestly due to the fact that the water had "bleached it," or caused the "outer cuticle to slip off'" of the parts examined by them. Others state emphatically that it was black where the "skin had not slipped off."

The next question is, Did Larkin Lancaster, the prisoner at the bar, perpetrate the murder? He is a married man, and in 1888 was living with his wife and children on Pisgah Hill, in Giles County. "Mandy" Crittenden, his sister-in-law, was also a member of his family. He was very partial to her, and said many extreme things to keep other men from associating with her. Zack Dixon, though several years her junior, paid her some attention. This seems to have greatly enraged defendant, and to have caused him to make deadly threats against the life of Zack Dixon. Some two weeks before his disappearance Zack Dixon attended a party at defendant's house, "danced with Mandy" and talked with her "outside of the house." On that occasion, while under the influence of liquor, Lancaster made threats of a most serious character. To the witness, Beck, he said he "would kill that —— rascal, Zack Dixon, if it was the last thing he ever did." At a later hour, the same evening, he attempted—as his father-in-law, Alex. Crittenden, testifies—to shoot Zack Dixon, and would have done so but for the timely interposition of the father-in-law. This was while "Zack was sitting outside of the house with

Mandy." Alex. Crittenden further says that when he "prevented" defendant from shooting, defendant said "this aint the last time," and that he "would drink 'his own heart's blood before he would let any man get in his path." He says, also, that he at another time heard defendant "tell Smith Woodson that he was going to kill Zack," and that he (witness) "advised him not to do any such thing."

Smith Woodson testifies that defendant said to him, two or three weeks before Zack Dixon's disappearance, that he "had told Zack to let Mandy alone," and that "Zack must do it," and if he did not, defendant would "kill him and put him away where he wont be found;" that in this conversation defendant said of Mandy, "she is mine."

Thus it is made to appear, without any proof to the contrary, that defendant had a strong motive to take the life of Zack Dixon. No motive to commit the crime is shown in any one else—not even a circumstance pointing to any other person as the murderer is disclosed in the record.

Walter Cross says he saw Zack Dixon at the foot of Pisgah Hill, one mile from defendant's house, and going in that direction, between sundown and dark, on the day of his disappearance; that Zack "said he would probably come to meeting after awhile," at a place of service in the neighborhood, but he did not do so.

That was the last time any of the witnesses

saw Zack Dixon alive. Where he was then going he did not state. On the following morning defendant voluntarily told W. C. Davis that Zack Dixon "had promised to come to his house the night before," but had failed to keep his promise.

At dark that night Wash Neal, in passing defendant's house, halted to inquire where "preaching was to be that night," and called defendant three times, loud enough to be heard in the house, but got no response. Prince Wilson and James Tucker say they came up while he was calling, and the three went to church together. Where defendant was at this time no witness knows. After being suspected of the murder of Zack Dixon, the defendant told James Tucker that he was in his house and heard the calling; but he assigned no reason for not answering. No witness saw him anywhere that night, nor any member of his family, except Mandy Crittenden, who was seen at church.

How he was engaged—if in his house or not, whether innocently, with none but his wife and children present; or secretly, with the dead body of Zack Dixon, already slain; or politely detaining him, with a view of accomplishing a foul purpose later on, at a more opportune hour—no witness undertakes to state, and the Court will not surmise.

Though defendant had two or three children of sufficient age to testify, he put none of them on the stand to say that Zack Dixon was not at his

house that night, or where he himself was, or how engaged.

Three witnesses, who were at as many different places in the neighborhood, say they heard one or more reports of a gun or pistol in the direction of defendant's house about nine or ten o'clock that Sunday night. This evidence is general. The witnesses did not profess ability to locate the sound of the gun or pistol with certainty.

If Zack Dixon was killed with gun or pistol, the wound or wounds must have been inflicted upon the missing head, for none could be discovered on the parts of the body rescued from the waters of Richland Creek.

W. C. Davis says he met defendant and his son in the public road, five miles from and going toward Pulaski, and three miles from Pisgah Hill, at eight o'clock Monday morning after Zack Dixon disappeared Sunday night; that defendant asked him the time of day, and then inquired if he had seen Zack Dixon in Pulaski, saying Zack "had promised to come to his house the night before, but he did not come;" that defendant was riding on one horse, with a sack in front of him, and his boy on another horse, with another sack;" that "the sacks were full, and looked like bags of rags or cotton;" that he "saw blood dropping from under the sack, down the shoulder of the horse the boy was riding;" that one of the sacks was made of tow and the other of cotton; that he observed them with sufficient care to see that de-

fendant "had the tow sack and the boy the cotton sack;" and, finally that they were "just like" the sacks in which the dead body was found, but he could not say that "they are the same."

Strangely, if innocent, the defendant introduces no witness to deny, explain, or in any manner break the force of these facts, strongly inculpatory as they are. Where he and his son were going that Monday morning, the character of the burdens they bore, and what they did with them, no witness is brought to state. Not even the son himself comes to declare that the trunk and limbs of Zack Dixon's dead body were not in the two sacks, and to explain or deny the dropping of blood from the sack in his charge. He, at least, knew the real facts, and could unquestionably have enlightened the Court and jury. Though living in the defendant's family and under his control, he is not introduced, and no excuse is given for his non-appearance as a witness.

That defendant was traveling upon a public highway and made no effort to avoid Davis does not, of itself, indicate innocence; nor does his voluntary reference to Zack Dixon at that time have that effect. The latter rather indicates guilt. If guilty of murder, with the body of his victim concealed before him, it was natural for him to make such inquiry and declaration as he did to avert suspicion. This record fails to disclose any other reason for mentioning Zack Dixon's name at that time.

It should be noted in passing that neither the State nor the defendant shows how far or in what direction the point at which defendant and his son met Davis is from Hicks' Bluff, near which the dead body was found.

Hutch Crittenden, a brother-in-law of defendant, testifies that defendant approached him soon after Zack Dixon's disappearance, and requested him "to say that Zack had stolen a horse and gone to Texas," and that witness "had given him two dollars to go off on." Witness says he replied that he did not let Zack have "any two dollars," and that he would not make the false statement requested.

Emily Currie says defendant went to her house the next week after Zack Dixon was missing and told her husband, in her presence, that he (defendant) was being accused of murdering Zack, and that he did not do it; that, upon being asked where Zack was, defendant said he had stolen a horse, and gotten two dollars from Hutch Crittenden and gone off to Texas; that defendant then told her husband in her hearing to circulate that story if any one inquired of him about Zack; that defendant got angry, swore, and denounced Hutch Crittenden as a falsifier when witness told him Hutch Crittenden denied letting Zack Dixon have any money.

Smith Woodson says defendant told him Zack Dixon had gotten "into a pistol case and ran away," as he had been informed by Hutch Crittenden.

James Tucker, one of the witnesses who passed defendant's house and heard Wash Neal calling him the night of Zack's disappearance, says defendant told him, about a week after that time, that "he expected they would have . him [defendant] up about Zack Dixon," and that he wanted witness "to stick to him;" and that defendant further said he was at home lying on the bed the night "Wash Neal called him, and heard every word that was said."

In fact, there were no charges against Zack Dixon. He had violated no law, and had no reason to flee the country, so far as can be seen from this record. The stories which defendant endeavored so anxiously and boldly to put in circulation were but the productions of his own brain. They had no foundation in fact.

Though no witness saw Larkin Lancaster take the life of Zack Dixon, the many circumstances detailed establish the fact as conclusively as if sworn to by credible eye-witnesses. They exclude every other reasonable hypothesis. Strong motive, deadly threats, favorable opportunity, strange secrecy about the premises, bold efforts to fabricate exculpatory evidence, unexplained possession of burdens corresponding in appearance with sacks known to contain parts of the dead body—all these concur.

As to the venue, but little need be said. Exactly where the murder was committed no witness knows, but the proof is that the place at which

Zack Dixon was last seen alive and Pisgah Hill, where defendant lived, and the public road, where Davis met defendant, and Hick's Bluff, on Richland Creek, where the dead body was found, are all in Giles County. This is sufficient.

The charge to the jury was full, clear, explicit, and accurate in all of its parts. On the most vital point in the case the Court said to the jury: "In order to warrant you in convicting the defendant in this case, the circumstances proven must not only be consistent with his guilt, but they must be inconsistent with his innocence, and such as to exclude every reasonable hypothesis but that of his guilt, for, before you can infer his guilt from circumstantial evidence, the existence of circumstances tending to show his guilt must be incompatible and inconsistent with any other reasonable hypothesis than that of his guilt."

All rulings as to evidence were correctly made.

It is assigned as error that the trial jury was not properly sworn. The position is not well taken. After reciting that defendant was "arraigned and charged upon the indictment in this case, and that he pleads not guilty thereto," the record states that the jurors were "elected, tried, and sworn well and truly to try the issues joined." Though omitting the words "and true deliverance make," and some other words of the common law form, the oath thus shown to have been administered is entirely sufficient. Language of precisely the same legal import has, more than once, been

held by this Court to meet the requirements of the law. *Fitzhugh* v. *The State*, 13 Lea, . 260; *Baxter* v. *The State*, 15 Lea, 657.

It was not decided in *Hargrove* v. *The State*, 13 Lea, 179, as insisted by counsel, that such an oath was insufficient. It was only said in that case that "if" an oath in like words "was defective," the defect was cured by a fuller statement of the oath in the minute entry containing the verdict.

It is also urged that the oath administered to the officers attending the trial jury was not a legal oath. The record recites that they were "sworn as required by law in such cases." Manifestly that recitation was sufficient. If they were "sworn as required by law," nothing more was essential. It was not necessary that the oath taken by such officers should be set out on the record. The bare statement that they were "sworn as required by law," or "according to law," is enough. *Taylor* v. *The State*, 6 Lea, 235.

The law prescribes a certain oath, and if the oath administered is set out on the record, to be good it must show all the requisites. *Buxton* v. *The State*, 5 Pickle, 216.

The recital, in subsequent entries in the case at bar, that the jury returned into Court "under charge of the same two officers heretofore sworn to *keep them,*" cannot justly be termed a statement of the oath really taken. The words, "*to keep them,*" were not used for such a purpose. The

object of these later entries was to identify the officers in charge of the jury, and not to set out the oath administered to them.

Finally, it is contended that a new trial should be awarded on account of matters set out in defendant's affidavit seeking that relief below.

The verdict returned was as follows: "We, the jury, find the defendant guilty of murder in the first degree, with mitigating circumstances."

The substance of the affidavit is, that upon retiring to consider of their verdict, some of the jurors were opposed to conviction because not satisfied of defendant's guilt, and they finally consented to a verdict of guilty only because they were, by the other jurors and the presiding Judge, "induced to believe" that under a verdict in the form rendered "the Court could adjudge a punishment short of death;" that affiant "is informed and believes that the verdict * * was so rendered because the jury had a doubt of defendant's guilt, and not because there were any mitigating circumstances;" that "affiant has tried to get some of said jury to make an affidavit, but they refused to do so," on account of which refusal he "asks the Court to call around the members of said jury and interrogate them as to the facts herein stated," affiant being "unable to get the true facts before the Court in any other way."

On presenting that affidavit defendant's attorney moved the Court to examine the jurors touching the matters therein stated. This the Court refused

to do, on the ground that the jurors had refused to make affidavits and seemed satisfied with their verdict.

The entry on the record further recites that "the only foundation for the statement in defendant's affidavit 'to the effect that some of the 'jurors would not consent to such a verdict until some of their number went to see the Judge, and returning stated such could be done,' was this: Said jury, shortly [before] returning their verdict, came into open Court, in a body, in charge of their officers, and one of said jurors asked the Court if in this kind of a case they could find 'mitigating circumstances;' the Court replied: 'Yes, you will find this matter in the written charge which you have;' whereupon the jury retired and in a short time returned their verdict."

The action of the trial Judge was right in both respects—in refusing a new trial upon the unsupported affidavit of defendant, and in declining to have the jurors examined about their verdict.

Conceding the truthfulness of the claim that some of the jurors would not have agreed to the verdict but for their belief that "the Court could adjudge a punishment short of death," that constitutes no ground for a new trial. The legal proposition which it is said "they were induced to believe," was entirely sound; the Court had the power supposed. Code (M. & V.), § 6098.

The other suggestion, that the "jury had a doubt of the defendant's guilt," is contradicted by

Lancaster *v.* The State.

and inconsistent with the verdict, whose verity cannot be questioned in the mode adopted.

As the jurors declined to make affidavits, and in no manner indicated any dissatisfaction with their verdict, the Court did right in refusing to have them examined on the unsupported affidavit of the defendant.

Such a practice as that sought to be introduced would, to say the least, result in interminable confusion and disorder not to be sanctioned for a moment. *Hannum* v. *State*, 6 Pickle, 647.

The case at bar is not analogous to that of *Nelson* v. *State*, 10 Hum., 532–534. There it was made manifest to this Court that the jury "were laboring under erroneous impressions as to the law of the case before them." It is not so here, for, by defendant's own statement, they correctly understood the law as to the legal effect of their verdict in the form rendered. There they returned a verdict unauthorized by law, and that under such circumstances as to indicate confusion in their minds; not so here. Besides, in that case, five of the jurors made affidavits showing unquestionably that they had been misled, without fault on their part. Here no juror makes an affidavit, and there is no indication that any of them were misled in any way.

Any assumption of defendant that some of them may have been misled by the Court with reference to the form of the verdict is refuted by the recital quoted from the record.

19—7 P

---

Lancaster *v*. The State.

---

After properly overruling motions for a new trial and in arrest of judgment, the trial Judge pronounced sentence of death upon the defendant, notwithstanding the finding of mitigating circumstances by the jury. He was authorized to do that, or to commute the punishment from death to imprisonment for life, as in his sound discretion, and upon an unbiased and discriminating survey of the whole case, the ends of public justice might seem to demand. Code (M. & V.), § 6098; *Greer* v. *The State*, 3 Bax., 322; *Lewis* v. *The State*, 3 Head, 127 and 150.

There was no abuse of that discretion in this case; no mitigating circumstances are disclosed in the record before us. In Lewis' case, as in this, the trial Judge declined the commutation.

Let the judgment be affirmed.