IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 2000 Session

**STATE OF TENNESSEE v. HENRY LEE BERRY**

**Direct Appeal from the Criminal Court for Knox County**
**No. 66841, Richard Baumgartner, Trial Judge**

**No. E1999-00704-CCA-R3-CD**
**August 3, 2000**

Henry Lee Berry appeals his Knox County conviction for second degree murder. Berry contends that (1) the evidence is insufficient to support his conviction; (2) the trial court erroneously admitted into evidence two recorded 911 telephone calls and an order of protection entered against the appellant by the victim; and (3) the trial court erred by failing to grant a mistrial when evidence of a pending rape charge in Nashville was introduced before the jury. Additionally, the appellant urges adoption of DNA testing on decomposed bodies to positively establish the identity of the victim. Although we conclude that admission of the 911 telephone calls and the order of protection was error, the error was harmless. Moreover, finding no other reversible error of law, we affirm the judgment of conviction entered by the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. and NORMA MCGEE OGLE, J., joined.

Keith E. Haas, Sevierville, Tennessee, attorney for appellant, Henry Lee Berry.

Paul G. Summers, Attorney General and Reporter, Michael Moore, Solicitor General, Mark A. Fulks, Assistant Attorney General, Randall E. Nichols, District Attorney General, and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The appellant, Henry Lee Berry, was found guilty by a Knox County jury of the second degree murder of Mary Leslie Kingree. The trial court sentenced the appellant, as a range II offender, to thirty-five years in the Department of Correction. In this appeal as of right, the appellant raises the following issues for our review:

I. Whether the evidence is sufficient to support the verdict of second degree murder;

II. Whether the State should be required to positively identify the body of the homicide victim by DNA analysis;

III. Whether the trial court properly admitted the "911" tape recordings and testimony regrading an order of protection against the appellant; and

IV. Whether the trial court should have granted a mistrial after admitting the "911" tape recordings.

Finding no reversible error of law, we affirm the judgment of the trial court.

## Background

On May 14, 1998, Detective Dwight Loop with the Knoxville Police Department was dispatched to a location near the Fifth Avenue viaduct. At the scene he was met by two uniformed police officers who directed him to a wooded area on the east side of Second Creek. The "area . . .was frequented by homeless people. It was like – they had been using different areas of that part of the creek as a camp." Entering the area, Detective Loop observed "what appeared to be a human body - - under some fifty-five gallon steel drums between the fence and an access road that runs . . . parallel to the creek." The body was located about one hundred yards from one of the individual encampments. "The body was badly decomposed. It had a heavy infestation of maggots. The hair had slipped off the scalp. It was pretty well gone." A pair of pants and "either a shirt or blouse" were on the body. The remains were then taken to the University of Tennessee morgue.

Dr. Sandra Elkins, Knox County Medical Examiner, received the body of the victim on May 15, 1998. Her post-mortem examination revealed:

> . . .[W]hat I had there was that it was the body of a Caucasian female [approximately forty years of age], and the first thing that caught my attention was that her [dark colored] jeans had been removed from her basically inside out with the left leg still caught around the shoe that was on the left foot.
> . . .
> Well, I called Dr. Murray Marks in the Department of Anthropology[1] when I saw what I had because the decomposition was so advanced that I knew that there would not be any organs remaining to be able to tell the cause of death. And if we were able to establish a cause of death, it would only be through the skeletal structures.
> . . .
> The internal organs had undergone decomposition, and the maggots feed on those also.
> . . .
> The skin that was left on the body was dried, brown, leather. . .like.

---

[1] She explained that Dr. Murray Marks is a forensic anthropologist; whereas, she is a forensic pathologist. "I'm an MD; he's a PhD. My specialty is in the soft tissue structures of the body more so, like the organs; whereas, his specialty is solely the bone or the skeletal structures."

. . .

> Dr. Marks and I estimated the [victim had been dead] three to four weeks at that time of year.
>
> . . .
>
> There were two fractures, one on either side of the mandible or the jaw. . . The fractures were fairly symmetrical, and they were behind the impacted wisdom tooth on the lower jaw.
>
> . . .
>
> The cricoid cartilage or the lowest cartilage in the neck or larynx was fractured. . .
> The hyoid bone was fractured on the right side. . .
> These are the typical fractures that we see in strangulation deaths.
>
> . . .
>
> The body did not have a right hand. There was just – basically where the hand would connect to the wrist there was just a stump there.

Dr. Elkins confirmed that the body was delivered as a "Jane Doe" and presumptively identified as Mary Leslie Kingree. In attempting to identify the deceased, Dr. Elkins, in conjunction with law enforcement, attempted to obtain the dental records of Ms. Kingree. The dental records were unavailable as they had been " destroyed in a flood."

Dr. Murray Marks testified that he examined the skeletal remains of the body. He explained that "[b]y looking at the breaks we can tell things about force, where it was applied. We can look at the breaks and tell if that happened before death, around the time of death, or after death." In examining the body in this case, Dr. Marks discovered that the jaw bone was fractured "on both sides back in the corners." Bilateral fractures of this nature indicate that "there's been some type of a blow to the front part of the jaw. . . ." He opined that "[i]t would take a pretty extreme force . . . substantial force" to create such an injury, *e.g.*, being struck with "a rock, club, tire, iron, pipe," "a rock or a brick."

On the date the body was discovered, Reverend Alan Reynolds was present at the scene. He was known on the streets as Brother Blue and, for the past twelve years, has been a "street preacher" providing a ministry to the chronic homeless. He holds "church services outdoors for the street people every Sunday" and "then we have a church at 618 Broadway. . . ." Reverend Reynolds testified that he was acquainted with Mary Leslie Kingree, whom he knew as "Katy." He described "Katy" as "five foot, five foot two, . . . a hundred and ten, a hundred and fifteen, sixteen pounds." "She was born with one arm that wasn't fully developed. . . . [her arm went to about] four to six inches above where the wrist would be." He recalled that he had not seen "Katy" for the "three or four weeks prior to the day that this body was found." "[S]he had been pretty regular in attendance at my church, and was, . . . trying to get her life together. . . ." "[W]e took her some food and some clothes, and [she] said, "I will see you-all at church." "[T]hat is the last time we saw her." He explained that she had been "staying on the concrete slab, which was approximately . . . fifty feet from where her body was found." He stated that the appellant and Ms. Kingree "camped together" and "traveled together." However, he never saw the appellant and Ms. Kingree "fight or having

verbal or physical altercations. . . ." He also stated that Ms. Kingree was addicted to "crack, also cocaine . . . and alcohol." "There were occasions that "Katy" was . . . separated from Henry, and she would be with . . .other individuals, yes."

Lenny James "Tear Drop" Gilliam testified he was acquainted with both the appellant and Ms. Kingree. He explained that, in 1997-1998, "[he and the appellant] r[a]n together every day, every night for two years solid flat. . . ." He also stated that he knew Ms. Kingree as "Lefty." He admitted that he had dated Ms. Kingree before she began a relationship with the appellant. Gilliam testified that, after the appellant and "Katy" had returned from Texas, the appellant approached him and asked if he had seen "Katy". Although Gilliam had seen "Katy", he did not reveal this to the appellant because she had asked him not to tell him that he had seen her because "he will kill me."[2] The appellant then stated, "Well, . . .if you see her before I do, you tell her, when I find her, I am going to kill her." The appellant was "highly P.O.'d" when he made the statement.

William Terrence Byrd, "Byrd", testified that he was acquainted with the appellant, but knew him only as "Tear Drop's Brother." He also was acquainted with Ms. Kingree, he described her as "a little short lady . . .one of her . . .arms is like . . cut off to about right up here to about the elbow." He knew "Katy" from the VOA, the Volunteer Ministry on Jackson and Gay Streets.

Byrd was held in the Knox County Detention Facility from March 22, 1998, until April 11, 1998. He stated that, shortly after his release from jail, he saw "Katy" at the "dayroom" at the ministry. Later that same day, while "reliev[ing] himself" in an area near the Fifth Avenue Viaduct, he observed the appellant and "Katy" across the creek from him. He related that the two were arguing.

> She was wanting him to leave her alone, and he was wanting her to go down to like . . .like the creek . . . like a beach. You know, it has got . . . a little tredge of water. And it is like . . .you have got like little rocks and stuff on the side. Then like on one side, you can't . . . but he was wanting her to go down that a way towards the . . . creek going down that a way. . .
> ...
> [S]he was wanting him to leave her alone. He was wanting her to go with him, and she didn't want to go.
> . . .
> He had his hands on her.
> . . .

---

[2] This statement is inadmissible hearsay evidence and, therefore, should not have been admitted. See *infra* Section I. See also State v. Leming, 3 S.W.3d 7, 17-18 (Tenn. Crim. App. 1998) (murder victim's statement as to fear of defendant inadmissible because victim's state of mind not relevant to an issue on trial). However, the appellant failed to object to this evidence at trial and does not raise the issue on appeal. In State v. Donald Ray Smith, W1998-00156-SC-R11-CD (Tenn. at Jackson, Jun. 30, 2000) (*for publication*), our supreme court held "[w]hen a party does not object to the admissibility of evidence, though, the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary; the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'"

Well, like when he struck her [in her face], that is when I left. . . .

Byrd recalled that the appellant was holding either a brick or a rock in his hand when he hit "Katy" and that the "hit" "wasn't no peck" "it was a good hard lick." He added that "Katy" was wearing "dark pants like blue jeans. . . ." He never saw "Katy" again after that day.[3]

In addition to this evidence, the State introduced audio-taped recordings of two "911" calls received by the Knox County E-911 Center. The first telephone call was received February 20, 1998; the second call on February 25, 1998. Both calls, made by Ms. Kingree, reported that the appellant was threatening to kill her. In addition, evidence of an ex parte order of protection obtained by the victim against the appellant on February 24, 1998, was introduced.[4] Officer Patricia Tipton testified that she was dispatched to the Salvation Army on February 25, 1998, in response to an emergency call placed by Leslie Kingree. On this date, Officer Tipton served the February 24 order of protection upon the appellant. Officer Tipton testified that Ms. Kingree was at her side while she read the order of protection to the appellant. The appellant demonstrated no response to the order of protection, other than uttering, "Whatever."

## I. Sufficiency of the Evidence

First, the appellant contends that the evidence was insufficient to convict him of second degree murder. Specifically, he contends that the evidence fails to establish, beyond a reasonable doubt, that the appellant was the perpetrator of the homicide and that the decomposed body was, indeed, that of Ms. Kingree. In support of his challenge, the appellant questions the credibility of State's witness, William Byrd, who testified that he observed the appellant and Ms. Kingree engaged in a physical confrontation near the crime scene on the date of Ms. Kingree's last appearance. Given the questionability of Mr. Byrd's testimony and the lack of other direct evidence, the appellant asserts that his conviction cannot stand.

Following a jury conviction, the initial presumption of innocence is removed from the defendant and exchanged for one of guilt, so that on appeal, the defendant has the burden of demonstrating the insufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). It is the duty of this court to affirm the conviction unless the evidence adduced at trial was so deficient that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789; State v. Cazes, 875 S.W.2d 253, 259 (Tenn.1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e). This court does not reweigh or reevaluate the evidence, nor may we replace our inferences

---

[3]Byrd explained that he did not report what he had seen because "it is like the code of the street. . . .[Y]ou see a lot of guys and their girls arguing all the time. . . . you try to keep the police away as much as possible."

[4]The order of protection was dismissed by the court on May 1, 1998, for lack of prosecution.

for those drawn by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Furthermore, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn.1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993). A jury verdict accredits the testimony of state's witnesses and resolves all conflicts in favor of the state's theory. State v. Williams, 657 S.W.2d 405, 410 (Tenn.1983). In State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.1990), this court held this rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

In order to obtain a conviction for second degree murder, the State is required to prove that the appellant caused the knowing killing of another. See Tenn. Code Ann. § 39-13-210(a)(1) (1997). Notwithstanding the State's burden of proof, a homicide, once proven, is presumed to be second degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn.1998), cert. denied, – U.S. –, 119 S.Ct. 1359 (1999). As part of its burden of proof, the State must prove beyond a reasonable doubt that the accused is the person who committed the offense. See White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App.1975), perm. to appeal denied, (Tenn. 1976). Identity of the accused may be accomplished by either direct or circumstantial evidence, or both. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury after a consideration of all competent evidence. See Biggers v. State, 219 Tenn. 553, 411 S.W.2d 696, 697 (Tenn.), cert. granted, 390 U.S. 404, 88 S.Ct. 979 (1968) (affirmed on other grounds); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451 (Tenn.1958); State v. Crawford, 635 S.W.2d 704 (Tenn. Crim. App.1982). Likewise, the determination of whether all reasonable theories are excluded by the circumstantial evidence presented is primarily a question of fact for the jury. Pruitt v. State, 460 S.W.2d 385 (Tenn. Crim. App.1970). This case is based upon both direct and circumstantial evidence. Indeed, in the case *sub judice*, the identity of the perpetrator was established by the testimony of an eyewitness, William Byrd, identifying the appellant, whom he knew as "Tear Drop's Brother," as the individual involved in a physical altercation with the victim prior to her disappearance.[5] The injuries to the decomposed body were consistent with the injuries allegedly inflicted upon Ms. Kingree by the appellant. Additionally, other evidence established that the appellant and Ms. Kingree were in a relationship and would "hang out" together. Finally, the appellant had related to "Tear Drop" that he was looking for Ms. Kingree and that he was going to kill her. Thus, the evidence establishing the appellant as the perpetrator of the murder is more than sufficient.

Notwithstanding the proof of his identity as the perpetrator, the appellant also challenges the sufficiency of the evidence establishing the identity of the victim as Ms. Kingree. He contends that, because the only evidence establishing the victim's identity was circumstantial, "[t]he identification of the body was a presumptive identification only." In a related issue, the appellant contends that

---

[5] Any challenge to the veracity of Byrd's testimony identifying the appellant is beyond the scope of this court's review as it is solely the role of the fact-finder to adjudge a witness' credibility.

the State should be required to positively identify the remains of unknown bodies.[6]  Specifically, he asserts that, since dental records were unavailable in the present case, the State should have performed DNA testing to establish the victim's identity.

In a prosecution for murder, the *corpus delicti* is a fact, the proof of which may be made by circumstantial evidence.  See  Berry v. State, 523 S.W.2d 371, 374 (Tenn. Crim. App. 1974).  This is true even where the body of a victim has been completely destroyed, decomposed, mutilated, or burned.  Id.  In such cases, the victim's identity may be established by evidence showing a similarity between the physical characteristics of the remains and of the victim, coupled with evidence that the clothing, or fragments thereof, found on or near the remains was the same as, or similar to, clothing worn by the victim.  Id. (citing V. Woerner, Annotation, *Homicide – Identification of Victim*, 86 A.L.R. 2d 771 (1962); Lancaster v. State, 91 Tenn. 267, 18 S.W. 777 (1892)).  Circumstantial evidence which may be admitted to establish the victim's identity may include fingerprints, medical and dental testimony, fragments of bone and portions of a body, clothing found on or near the body, other personal effects found on or near the body, photographs of the living victim or of the body, a dying declaration, and other kinds of evidence.  See generally V. Woerner, Annotation, *Homicide – Identification of Victim*, 86 A.L.R.2d at 722.  Circumstantial evidence related to identity affords satisfactory proof of the *corpus delicti* in a murder case where the evidence excludes every reasonable hypothesis except that of guilt.

In the present case, the appellant asserts that the State failed to use the best proof available in establishing the identity of the victim, *i.e.*, DNA testing.  Although he concedes that the "evidence in this case may tend to show that the body was actually Ms. Kingree," the appellant suggests that the failure of the State to employ DNA testing in the present case violates "equal rights and equal protection under the United States Constitution and the Tennessee Constitution."  We disagree.  Although DNA evidence may be highly reliable proof just as fingerprint evidence is strong evidence, it still remains circumstantial in nature.  See, e.g.,  Billy Jack Thomas v. State, CR-96-0876 (Ala. Crim. App. Dec. 30, 1999); People v. Groves, 854 P.2d 1310, 1315 (Colo. App. 1992); Greenway v. State, 428 S.E.2d 415, 516 (Ga. App. 1993); People v. Stremmel, 630 N.E.2d 1301, 1307 (Ill. App. 1994); State v. Spaeth, 552 N.W.2d 187, 192-93 (Minn. 1996); Parker v. State, 606 So.2d 1132, 1140-41 (Miss. 1992).  We fail to find persuasive the appellant's attempt to elevate the State's burden by requiring DNA analysis in cases of decomposed bodies. Circumstantial evidence in forms other than DNA analysis  are clearly acceptable means of proof of identity.

We, in turn, examine the evidence presented in the case *sub judice* establishing the identity of the decomposed body as that of Ms. Kingree.  Again, the dental records of Ms. Kingree were unavailable and DNA analysis was not performed.  However, the State presented proof that Ms. Kingree was born without a right hand.  The body of the victim was without a right hand.  The State introduced testimony that Ms. Kingree was last seen wearing dark pants, possibly jeans.  The victim's body was found with dark jeans.  William Byrd testified that he observed the appellant hit

---

[6]Because the appellant's Issue #2 cannot be separated from his attack on the sufficiency of the evidence identifying the decomposed body, we address these issues simultaneously.

Ms. Kingree in the face with a brick; the body of the victim had a broken jaw consistent with being struck in the front of the jaw with a brick or rock. The body of the victim was found within fifty feet of the area where Ms. Kingree was known to camp. We conclude that this evidence is sufficient to establish the identity of the decomposed body as Ms. Kingree. Accordingly, this issue is without merit.

## II. Admission of 911 telephone conversations

The appellant, arguing that he was denied his constitutional right to confront his accuser, contends that the trial court improperly permitted admission of two 911 telephone calls and the February 24th order of protection obtained by Ms. Kingree. Specifically, the appellant contends that the State failed to prove that the declarant was unavailable to testify, therefore, precluding admission of the hearsay statements.[7] In a related issue, the appellant contends that the trial court should have granted a mistrial based upon that portion of the 911 call "making reference to a rape conviction and/or charge pending in Nashville. . . ."

It was the State's position at trial that the two 911 emergency calls and the order of protection were admissible as evidence of the victim's state of mind. See Tenn. R. Evid. 803(3). The first telephone call, received on February 20, 1998, related Ms. Kingree's report that the appellant was threatening to kill her. During this conversation, Ms. Kingree reported that the appellant "has a felony charge in Nashville."[8] The second call, on February 25, 1998, related that Ms. Kingree was requesting that an order of protection be served on the appellant.[9]

_____

[7]"The Rule 803 exceptions do not require the declarant's unavailability." See NEIL P. COHEN ET AL., *Tennessee Law of Evidence § 804(a)(1)*, 589 at fn. 320 (3d ed. 1995).

[8]

**911 Operator:** Mam, okay what is the problem?
**Kingree:** I have been with this man and he is threatening to kill me.
**911 Operator:** Where is he at now?
**Kingree:** I am at the Salvation Army I came here to eat lunch and he took off and I'm scared and I'm homeless and I'm scared to leave here because I'm afraid that he is going to accost me again. . . .
**Kingree:** His name is Henry Lee Berry. B-E-R-R-Y. . . .
**911 Operator:** Did he have a weapon.
**Kingree:** Uh, probably has a pocket knife. . . I think to the best of my knowledge he has a felony charge in Nashville.
**Kingree:** . . . I'm willing to go downtown . . . My name is Leslie Kingree. K-I-N-G-R-E-E. . . .

[9]

**Kingree:** Yes, I have called down here three times. Now I am being harassed by a man. I am down at the Salvation Army. I have an order of protection against him and I have to pay for a serving officer. You said you won't send it down to the server, they will not be in to the office until tomorrow.
**911 Operator:** What's your name?
**Kingree:** My name is Leslie Kingree. K-I-N-G-R-E-E.
**911 Operator:** . . . Who is it that is bothering you?
**Kingree:** The man has threatened my life - Henry Lee Berry. B-E-R-R-Y.
**Kingree**: He's at the dining room of the Salvation Army and if the officer doesn't hurry he is going to be gone.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Generally, hearsay is not admissible. Tenn. R. Evid. 802. However, numerous exceptions to this rule exist including Tenn. R. Evid. 803(3) which allows admission of a declarant's then existing state of mind, emotion, sensation, or physical condition. Declarations of mental state are admissible to prove the mental state at issue or to prove subsequent conduct consistent with that mental state. See Advisory Commission Comments, Tenn. R. Evid. 803(3). Under Rule 803(3), hearsay evidence may be admitted to show the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." The state of mind presented by the recorded 911 calls is that of the victim, not the appellant. Evidence that another person declared a state of mind that is in its nature and character consistent with conduct in which the actor is alleged to have subsequently engaged is not reasonably probative of a claim that the actor engaged in the conduct.

The State concedes that the trial court's admission of the 911 tapes was erroneous. We agree, finding the recordings were not relevant to any matter in issue.[10] Although the victim's statements satisfy the requirements for Rule 803(3), the victim's fear of the appellant was irrelevant in establishing the appellant's guilt or innocence. See, e.g., State v. Leming, 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998)( a statement relating the declarant's state of mind may be admitted if the declarant's state of mind is relevant to a fact at issue in the case and its probative value must not be substantially outweighed by its prejudicial impact); State v. John Parker Roe, No. 02C01-9702-CR-00054 (Tenn. Crim. App. at Jackson, Jan. 12, 1998), perm. to appeal denied, (Tenn. Jan. 4, 1999). The evidence of the victim's statements invites speculation and not rational inference with respect to these issues and should have been excluded.

For similar reasons, we conclude that the order of protection should not have been admitted. Specifically, proof that the victim feared the accused necessarily creates an inference that the accused had threatened or otherwise harmed the victim or someone else in order for that fear to have been instilled in the victim's mind. Such prior acts on the part of the accused are typically collateral to the criminal conduct alleged and, to the extent that they demonstrate a propensity to commit bad acts, are inadmissible per Tenn. R. Evid. 404(a). The inference is not avoided by excluding evidence of the victim's actual reasons for fearing the accused. This evidence may be admissible per Tenn. R. Evid. 404(b), if admitted for purposes, *e.g.*, motive, opportunity, intent , preparation,, identity, other than to prove that the defendant engaged in conduct conforming to the crime for which he stands charged. However, the matter concerned must genuinely be in issue.

_____

[10] As conceded by the State, the trial court erroneously relied upon State v. Charles N . Howell, No. 03C01-9406-CR-00203 (Tenn. Crim. App. at Knoxville, Feb. 12, 1996), perm. to appeal denied, concurring in results only, (Tenn. Jul. 8, 1996). In Howell, a panel of this court held that the victim's statement of fear of the defendant showed the victim's state of mind and was relevant to show that the defendant had given her a reason to believe he was considering killing her. As the defendant was charged with first degree murder, the court found this evidence relevant as to the issue of premeditation. Premeditation is not at issue in the present case. Accordingly, the rationale in Howell is not applicable in the present case.

In the present case, the "911" calls and the entry of the order of protection occurred in late February 1998, the murder of Ms. Kingree occurred sometime in April of that same year. Accordingly, these occurrences are factually and chronologically unrelated to the circumstances of the murder. At trial, the appellant's defense was that the victim was not Ms. Kingree. Therefore, intent, mistake, opportunity, identity, motive, etc., were not in issue. In other words, any prior incidents or acts of confrontation between the victim and the appellant were irrelevant.

Notwithstanding error in the admission of the 911 calls and the order of protection, such error is harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). The proof of the appellant's previous threat to kill the victim, eyewitness testimony that the appellant struck the victim with a brick near the crime scene, and the jaw fractures on the decomposed body consistent with being struck with a brick are sufficient to support the appellant's conviction. Thus, any error is harmless.

As a sub-issue to the admissibility of the 911 calls, the appellant challenges the prejudicial impact of a statement in one of the calls which makes reference to a "felony charge in Nashville." The appellant immediately objected to this statement in the tape recording and moved for a mistrial. The trial court sustained the objection, gave the jury a curative instruction, but denied the motion for mistrial. The appellant now contends that the trial court erred in not granting a mistrial. The appellant's argument is based primarily upon the fact that the "911" call related a pending rape charge in Nashville and that, this charge, combined with the position of the clothing on the decomposed body suggested a sexual motive for the murder and, thus, was extremely prejudicial. We find, however, that there is absolutely no reference in the audio recordings to any "rape," rather the tape refers simply to a "felony charge."

The decision of whether to grant a mistrial is within the sound discretion of the trial court. See State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App.1996). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App.1991). In reviewing a trial court's denial of a motion for mistrial, this court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn.1990); Williams, 929 S.W.2d at 388. In the present case, the appellant has shown no manifest necessity that would require a mistrial. Indeed, despite the appellant's assertion, the audiotape did not provide the jury with any information relative to the nature of the felony charge in Nashville. Moreover, the trial court provided the jury with an instruction that they were to disregard the information of the felony charge. We presume that the jury followed the trial court's explicit instruction not to consider the inappropriate evidence. State v. Smith, 893 S.W.2d 908, 923 (Tenn.1994). Under these circumstances, we hold that the trial court did not abuse its discretion when it denied the motion for a mistrial. This issue has no merit.

Finding no reversible error, we affirm the judgment of conviction entered by the trial court.

DAVID G. HAYES, JUDGE

-10-