IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

## STATE OF TENNESSEE v. KENNETH R. GRIFFIN

**Direct Appeal from the Criminal Court for Washington County**
**No. 21926  Arden L. Hill, Judge**

_____

**No. E1998-00037-CCA-R3-CD - Decided**

_____

The defendant, who was convicted of first degree murder and especially aggravated robbery, challenges the sufficiency of the evidence for his first degree murder conviction and also challenges both of his sentences.  The convictions and sentences are affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

WADE, P.J., delivered the opinion of the court, in which WELLES and HAYES, JJ., joined.

Clifford K. McGown, Jr. (on appeal), Waverly, Tennessee, James T. Bowman (at trial) and Scott Pratt (at trial), Johnson City, Tennessee, and Collins Landstreet (at trial), Elizabethton, Tennessee, for the appellant, Kenneth R. Griffin.

Paul G. Summers, Attorney General and Reporter, Eric W. Dabb, Assistant Attorney General, and Joe Crumley and Michael Laguradia, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

The defendant, Kenneth R. Griffin, was convicted of first degree murder and especially aggravated robbery.  The state had filed a notice of intent to seek the death penalty or life without parole.  Following the jury trial, the defendant waived his right for a jury determination of his sentence and, by agreement with the state, accepted a sentence of life without the possibility of parole for the first degree murder.  The trial court sentenced the defendant to a term of 23 years for especially aggravated robbery, to be served consecutively to the first degree murder sentence.

In addition to his challenge to the sufficiency of the evidence to support the first degree murder conviction, the defendant presents the following issues for appellate review:

> (1)    whether the trial court erred by the imposition of a 23-year sentence for the especially aggravated robbery conviction and whether the trial court erred by ordering consecutive

sentences; and

(2)    whether the trial court properly sentenced the defendant to life without the possibility of parole as part of a negotiated plea agreement in exchange for the state's withdrawal of its request for the death penalty;

We find no error and affirm the judgment of the trial court.

On August 4, 1995, the victim, K. D. Norris, failed to open his barber shop, which was located at his residence in the Boone's Creek area of Washington County. Concerned family members contacted the sheriff's department and Sergeant Daniel Rhudy was called to the scene. Officers searched the barber shop and connecting residence but found nothing. A member of the victim's family suggested a search of the garage which the defendant had been employed to construct. Sergeant Rhudy and Lieutenant Edward Graybeal found the body. The victim was lying face down, hands tied behind his back, in a pool of blood. Dr. William McCormick, a forensic pathologist, investigated the scene and later performed an autopsy. He determined that a stab wound to the neck, which severed the jugular vein, was the cause of death. Dr. McCormick also found "a good bit of blunt force damage, a number of stab wounds, a missing tooth, broken ribs, and a broken collar bone." He concluded that the victim had been "strung up" or "hung" by what appeared to be a cloth curtain and that, in consequence, the bones in his neck had been crushed. Dr. McCormick estimated that the injuries had been inflicted over a period of one to two hours and that the victim died sometime between 6:00 P.M. on August 3 and 8:00 A.M. on August 4.

Larry Mullins, the victim's first cousin, had last seen the victim on Sunday, July 30. Mullins confirmed that at that time the victim had displayed a large amount of cash in his wallet, including an inch or two of one hundred dollar bills. The victim also had a three-inch stack of bills of unknown denominations in his front pants pocket. Mullins was aware that the victim had complained about poor workmanship by the defendant and intended to employ another contractor to correct his work. The victim had also indicated to Mullins that he planned to employ an attorney in regard to the construction problems.

Estelle McKinney, a close friend of the victim, confirmed that the victim often carried large sums of cash and that the victim had been displeased with the quality of construction on the garage. She had last talked with the victim between 8:00 and 9:00 P.M. on August 3. Ms. McKinney recalled that at the time, the defendant was working on the garage and the victim, in contrast to his earlier remarks, expressed satisfaction with the construction.

On the day the body was found, TBI Agent Shannon Morton questioned the defendant. The defendant contended that he had worked on the victim's garage from 5:00 P.M. to between 8:00 and 9:00 P.M. He claimed that he had been wearing shorts, a black shirt, and "flip-flops" while working on the garage. The defendant asserted that he had been repairing the motion sensor light. He stated that he returned to his home at 10:00 P.M.

Agent Morton had determined that the sensor light was not operable when he investigated the crime scene. Thus, two days after the initial interview, Agent Morton conducted a second interrogation. During questioning, he recovered $624.00 in cash from the defendant, including a blood-stained fifty-dollar bill. Agent Morton discovered a cut on one of the defendant's hands which had been bandaged. A witness stated that the defendant did not have this injury the day before the murder.

Officer Dennis Higgins, who conducted a search of the defendant's vehicle, recovered $13,800.00 in one hundred dollar bills. The bills were wrapped by a large red rubber band similar in nature to those contained in a bag of rubber bands recovered at the crime scene. Officer Higgins also found a pair of tennis shoes belonging to Ferrell Routh. It was established that at 10:00 P.M. on August 3, the defendant, who was wearing pants and boots rather than shorts and "flip-flops," as he had earlier alleged, paid his rent in cash.

TBI Special Agent Samera Zavaro determined that the stain on the fifty-dollar bill was human blood. A DNA analysis was impossible due to the small size of the sample. A blood stain was also found on one of the boots recovered from the defendant. TBI forensic scientist and shoe print expert Linda Littlejohn compared the sole of the boot with bloody shoe prints at the crime scene. Agent Littlejohn concluded that the sole of the defendant's boot was the same size, shape, and tread design as the bloody prints. Agent Littlejohn, who had examined thousands of shoes, testified at trial that the defendant's boot, size 15, was the largest she had ever analyzed.

Agent Morton determined that the defendant made a number of small purchases within a few days after the murder, including payment of a late cable television invoice, payment for an upgrade of cable service, and gifts for himself and his girlfriend, Rhonda Morton (apparently no relation to Agent Morton), with whom the defendant resided at the time of the murder. The estimated amount of his total payments and purchases was $1,175.00. Ms. Morton testified that she had never known the defendant to have large sums of cash in his possession. Furthermore, it was established that on August 3, the day of the murder, the defendant had pawned a Makita Sawsall saw. On the next day, the defendant paid off the loan, including 30 days of interest, and retrieved the saw.

Donald Harry Urich, Jr., who shared a cell with the defendant during the period between his arrest and the trial, testified for the state. Urich maintained that the defendant confessed to having conspired with Ferrell Routh, a former employee, to kill the victim. According to Urich, the defendant related several details of the murder. He contended that the defendant acknowledged his involvement but asserted that Routh actually committed the crime.

James David Strickler, who had several prior drug and theft-related offenses, testified that he worked for the defendant on the victim's garage for five days. He claimed that he saw the defendant's vehicle at the victim's residence at 3:30 P.M. on August 3 and again at 4:30 P.M.

Bea Bennett testified for the defense. She claimed that between 5:00 and 5:30 P.M. on August 3, she saw Strickler's vehicle parked at the victim's barber shop. She stated that she

reported what she had seen to a representative of the sheriff's department who said they had "chose the other guy." Ms. Bennett testified that she told the officer that she "didn't believe the guy was the only one. . . ." She stated that she did not see the defendant at the time she saw Strickler.

Lori Stevens, Strickler's former girlfriend, also testified for the defense. She recalled that Strickler had told her shortly after the murder that he was "pretty upset" about the murder and "was nervous because he was getting drug in it." Ms. Stevens contended that Strickler said he was "afraid that he was going to get in trouble . . . because of Ferrell Routh." She recalled that Strickler admitted having $3,500.00 in his possession that had "come out of the garage." Ms. Stevens, who was serving time on a burglary conviction and other small offenses, conceded on cross-examination that Strickler said that he had left the garage "before it got too bad."

Routh was also called as a defense witness. He denied having been at the victim's residence on the date of the murder and stated that he saw Strickler at his apartment in Johnson City between 6:00 and 7:00 P.M. Routh denied killing the victim. Routh recalled that the defendant, sometime before the murder, had mentioned that the victim kept a briefcase containing a large sum of money. Telephone records indicated that Routh received long-distance calls at 7:40 P.M. and 10:26 P.M. at his apartment in Bluff City on the night of the murder.

Charles Richardson, an inmate in the Washington County Jail, also testified for the defense. He testified that some eight months after the murder, Routh admitted killing the victim. When interviewed by police, Richardson stated that he didn't know whether Routh was joking about the murder or not. Richardson did not learn any details about the murder, including whether anyone else might have been involved. At the time of the conversation, Richardson was smoking marijuana and was drinking with Routh. At the time of his testimony, Richardson was serving sentences for burglary, evading arrest, and traffic violations. He had a prior conviction for aggravated assault.

Initially, the defendant claims that the evidence was insufficient to support a first degree murder conviction. He argues that there was reasonable doubt due to the absence of any forensic evidence linking him with the crime scene.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). This court must neither re-weigh nor re-evaluate the evidence, id. at 836, and may not substitute its inferences for those drawn by the trier of fact, Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).

When the sufficiency of the evidence is challenged, the relevant question is whether, when the evidence is viewed in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of any conflicts in the evidence are matters entrusted exclusively to the jury as the trier

of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). A guilty verdict, approved by the trial court, accredits the testimony of the witnesses for the state, and resolves all evidentiary conflicts in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

A criminal offense may be established exclusively by circumstantial evidence. Marable v. State, 203 Tenn. 440, 313 S.W.2d 451 (1958). On appeal, the standard established by Rule 13(e) of the Tennessee Rules of Appellate Procedure is equally applicable to both verdicts based on direct evidence and verdicts based upon circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

The evidence, in our view, was sufficient to support the defendant's first degree murder conviction. Without reciting the trial testimony in its entirety, we note that the state established a motive for the crime as well as opportunity. Evidence suggested that the defendant was untruthful in his original statement to police, both as to the actual time he spent at the defendant's residence on the date of the murder and as to his address. The defendant was also untruthful to the police regarding the clothing that he was wearing on the day of the murder. The proof showed that the defendant rarely had large sums of cash but, immediately after the murder, either spent or had in his possession approximately $15,000.00 in cash. There was a human blood stain on a fifty dollar bill found in his possession. The defendant had a cut on his hand which was not present just before the time of the murder. The most critical evidence, however, was provided by the TBI shoe print expert, who established a match between the bloody shoe prints at the crime scene and the sole of the defendant's boots. The unusually large size of the defendant's shoe discounted the likelihood of coincidence. There was other circumstantial evidence which tended to support the position of the state. Finally, the jury chose to accredit the testimony of Donald Urich who testified that the defendant confessed that he had been involved in planning and committing the murder with Ferrell Routh. Thus, the defendant's sufficiency of the evidence claim is not a basis for relief.

Next, the defendant contends that the 23-year sentence for especially aggravated robbery was excessive and should not have been ordered to be served consecutively to the first degree murder sentence. He asserts that the punishment for robbery was already enhanced by the facts and that the term of 23 years was unnecessary. He submits that because the first degree murder sentence was life without parole, there was no need for the robbery sentence to be consecutive.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and

sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The record in this case demonstrates that the trial court made adequate findings of fact.

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

If the trial court's findings of fact are adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785 (Tenn. Crim. App. 1991). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and relevant facts and circumstances." Ashby, 823 S.W.2d at 169. The trial court must place on the record the reasons for the sentence. Jones, 883 S.W.2d at 599.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . .
> . the aggregate maximum of consecutive terms must be reasonably
> related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

---

[1]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed

(1) The defendant is a professional criminal who has knowingly devoted [himself] to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

A Range I sentence for especially aggravated robbery has a minimum of 15 years and a maximum of 25 years. Tenn. Code Ann. §§ 40-35-111; 40-35-210(c). The trial court concluded that there were three enhancement factors applicable: (1) that the defendant had a prior history of criminal behavior; (2) that the defendant had a history of unwillingness to comply with conditions

criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

-7-

of his sentence involving release in the community; and (3) that the felony was committed while the defendant was on a release status from a prior felony conviction, i.e., bail. Tenn. Code Ann. § 45-35-114(1), (8), (13). The defendant does not argue about the applicability of any one of the three enhancement factors. Moreover, he does not argue that there were any applicable mitigating factors. In our view, the record fully supports the application of the enhancement factors and the 23-year sentence.

The trial court also concluded that there were two grounds for a consecutive sentence: (1) that the defendant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood; and (2) that the defendant is an offender whose record of criminal activity is extensive. See Tenn. Code Ann. § 40-35-115(b)(1), (2). The latter conclusion was based upon the trial judge's determination that the defendant, age 33 at the time of trial, had committed 22 prior felonies (6 Class D felonies and 16 Class E felonies) and a number of Class A misdemeanors. Included among the offenses were several counts of automobile burglary, several counts of theft of tools, appliances, equipment, and the like, and several counts of issuing worthless and fraudulent checks. The crimes were committed at residences, at businesses, and in automobiles. The defendant claimed to have been self-employed since 1992. Most of his property crimes were committed after that date. It would be difficult not to classify the defendant as a professional criminal. See Tenn. Code Ann. § 40-35-115(b)(1). Additionally, consecutive sentencing is justified by the defendant's "record of criminal activity [which] is extensive." See Tenn. Code Ann. § 40-35-115(b)(2). Finally, a trial court may order sentences to be served consecutively to a sentence of life without parole. See, e.g., State v. Bivens, 967 S.W.2d 821, 825 (Tenn. Crim. App. 1996).

The defendant's final argument is that he should have been sentenced to a term of life rather than to a term of life without the possibility of parole. At the conclusion of the guilt phase of the trial, the defendant, having been convicted of both first degree murder and especially aggravated robbery, chose to waive his right to a jury in the sentencing phase of the trial and acquiesced to the state's recommendation that he receive a sentence of life imprisonment without the possibility of parole. The state insists that the defendant may not challenge on appeal a negotiated sentence and that, therefore, the issue was waived.

The trial court found two aggravating circumstances under Tenn. Code Ann. § 39-13-204:

> (5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; [and]

> (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in the committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a

destructive device or bomb.

Tenn. Code Ann. § 39-13-204(i)(5), (7).

In recognition of the substantial discretion afforded the finder of fact in determining which sentence to impose, the statute governing appellate review declares that "[a] sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of . . . discretion." Tenn. Code Ann. § 39-13-207(g). A misapplication of an aggravating circumstance in a life without parole case is not a constitutional violation because there is no death sentence. State v. Harris, 989 S.W.2d 307, 317 (Tenn. 1999).

The proof, of course, was that the victim had been "tortured" for one to two hours before his death and that, during that time, several injuries were inflicted by blunt force or by a knife. The victim was "strung up" and, according to expert testimony, would have died as the result of that had his jugular vein not also been severed. The victim's hands were tied behind his back. In short, our view is that the evidence supported the application of Tenn. Code Ann. § 39-13-204(i)(5).

There is also evidence that the defendant participated in the plan to rob and murder the victim. He was found in possession of more than $13,000.00 in cash and had spent over $1,000.00 more within just a few days after the murder. This evidence supports the application of Tenn. Code Ann. § 39-13-204(i)(7). Accordingly, a sentence of life without parole was appropriate.

The judgment is affirmed.